## Case No. 14,501.

### UNITED STATES v. BAKER et al.

[5 Blatchf. 6.] [1]

Circuit Court. S. D. New York. Oct. 30, 1861.

CRIMES ON HIGH SEAS—JURISDICTION—DISTRICT WHERE FIRST BROUGHT — ROBBERY — PIRACY — CONFEDERATE PRIVATEER—BELLIGERENT RIGHTS —RECOGNITION.

1. Semble, that, under the fourteenth section of the act of March 3d, 1825, (4 Stat. 118,) which provides that the trial of all offences which shall be committed upon the high seas, or elsewhere, out of the limits of any state or

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

district, shall be in the district where the offender is apprehended, or into which he may be first brought, an offender captured on the high seas by a public armed vessel of the United States, and ordered to New York for trial, and put on board of a vessel destined for Hampton Roads, and taken to Hampton Roads, and there transferred to another vessel by which he is taken to New York, where he is arrested for the offence, is not to be regarded as having been brought into the district in which Hampton Roads is situated.

2. That provision of the fourteenth section is in the alternative, and, under it, an offender may be tried either in the district into which he is first brought, or in the district in which he is apprehended, under lawful authority, for trial for the offence.

3. The third section of the act of May 15th, 1820, (3 Stat. 600,) in regard to robbery on the high seas, applies to all persons, whether citizens or foreigners.

4. The ninth section of the act of April 30th, 1790, (1 Stat. 114,) in regard to piracy or robbery on the high seas, applies only to citizens and not to foreigners.

5. A nation at war may commission private armed vessels to carry on war against its enemy on the high seas, and the commission will afford protection, even in the judicial tribunals of the enemy, against a charge of the crime of robbery or piracy.

6. Such a commission would be a good defence against an indictment under the third section of the act of 1820.

7. The ninth section of the act of 1790 changes that rule, as it respects citizens of the United States who take service under a commission to a private armed vessel from the enemy of their country.

8. The term "robbery," as used in the third section of the act of 1820, means, the felonious taking of the goods or property of another, of any value, from his person or in his presence, against his will, by violence or putting him in fear.

9. A felonious taking means a taking with a wrongful intent to appropriate the goods of another.

10. The taking, to be within said third section, need not be a taking which, if upon the high seas, would amount to piracy according to the law of nations.

11. Piracy according to the law of nations, defined.

12. Until the legislative and executive departments of the United States government recognize the existence of a new foreign government, the courts of the United States cannot do so; and the same doctrine applies to the erection of a new government within the limits and against the authority of the government of the United States.

13. The courts must look to the acts of those departments as evidence on the question of such recognition.

This was an indictment against Thomas Harrison Baker, John Harleston, Charles Sidney Passalaigue, Henry Cashman Howard, Joseph Cruz del Carno, Henry Oman, Patrick Daly, William Charles Clark, Albert Gallatin Ferris, Richard Palmer, John Murphy, Alexander Carter Coid, and Martin Galvin. It was found on the 26th of June, 1861. The defendant Baker was the master, and the other defendants were a part of the officers and crew of a private armed schooner, called the Savannah, and claimed to have acted, in

committing the alleged offences, under the authority of the following commission: "Jefferson Davis, President of the Confederate States of America, to All Who Shall See These Presents—Greeting: Know ye, that by virtue of the power vested in me by law, I have commissioned, and do hereby commission, the schooner or vessel called the Savannah, (more particularly described in the schedule hereunto annexed,) whereof T. Harrison Baker is commander, to act as a private armed vessel in the service of the Confederate States, on the high seas, against the United States of America, their ships, vessels, goods and effects, and those of their citizens, during the pendency of the war now existing between the said Confederate States and the said United States. This commission to continue in force until revoked by the president of the Confederate States for the time being. Given under my hand and the seal of the Confederate States, at Montgomery, this eighteenth day of May, A. D. 1861. (L. S.) Jefferson Davis. By the President. R. Toombs, Secretary of State. Schedule of description of the vessel: Name—schooner Savannah. Tonnage—fifty-three 41/95 tons. Armament—one large pivot gun and small arms. No. of crew—thirty." The substantive offence charged, was the capture, by the Savannah, on the high seas, on the 3d of June, 1861, of the brig Joseph, belonging to citizens of the United States. The indictment alleged, that the Southern district of New-York was the district into which the defendants were brought, and in which they were found, and where they were apprehended, and into which they were first brought for the offence.

William M. Evarts, E. Delafield Smith, Dist. Atty., and Samuel Blatchford, for the United States.

Daniel Lord, James T. Brady, Jeremiah Larocque, Algernon S. Sullivan, Joseph H. Dukes, Isaac Davega, and Maurice Mayer, for prisoners.

Before NELSON, Circuit Justice, and SHIPMAN, District Judge.

NELSON, Circuit Justice, charged the jury as follows:

The first question presented in this case is whether or not the court has jurisdiction of the offence. This depends upon the following clause in the 14th section of the act of congress of March 3d, 1825 [4 Stat. 118], as follows: "And the trial of all offences which shall be committed upon the high seas or elsewhere out of the limits of any state or district, shall be in the district where the offender is apprehended, or into which he may be first brought." The prisoners, who were captured by an armed vessel of the United States, off Charleston, S. C., were ordered by the commander of the fleet to New-York for trial; but the Minnesota, on board of which they were placed, was destined for Hampton Roads, and it became

necessary therefore, that they should be there transferred to another vessel. They were thus transferred to the Harriet Lane, and, after some two days' delay, consumed in the preparation, they were sent on to this port, where they were soon after arrested by the civil authorities. It is insisted, on behalf of the prisoners, that inasmuch as Hampton Roads, to which place the prisoners were taken, and where they were transferred to the Harriet Lane, was within the Eastern district of the state of Virginia, the jurisdiction attached in that district, as that was the first district into which the prisoners were brought. The court is inclined to think that the circumstances under which the Minnesota was taken to Hampton Roads, in connection with the original order by the commander, that the prisoners should be sent to this district for trial, do not make out a bringing into that district, within the meaning of the statute. But we are not disposed to place the decision on this ground. The court is of opinion that the clause conferring jurisdiction is in the alternative; and that jurisdiction may be exercised either in the district in which the prisoners were first brought, or in that in which they were apprehended under lawful authority for the trial of the offence. This brings us to the merits of the case. The indictment under which the prisoners are tried, contains ten counts. The first five are founded upon the third section of the act of congress of May 15th, 1820 [3 Stat. 600], which provides: "That if any person shall, upon the high seas, * * * commit the crime of robbery, in or upon any ship or vessel, or upon any of the ship's company of any ship or vessel, or the lading thereof, such person shall be adjudged to be a pirate," and upon conviction shall suffer death. The five several counts charge, in substance, that the prisoners did, upon the high seas, enter in and upon the brig Joseph, the same being an American vessel, and upon the ship's company, naming them, did, then and there piratically, feloniously, and violently make an assault upon them, and put them in personal fear and danger of their lives; and did, then and there, the brig Joseph, her tackle and apparel, her lading (describing it), which were in the custody and possession of the master and crew, from the said master and crew, and from their possession, and in their presence, and against their will, violently, piratically, and feloniously seize, rob, steal, take, and carry away, against the form of the statute, etc. There are some variances in the different counts, but it will not be material to notice them. It will be observed that this provision of the act of congress prescribing the offence applies to all persons, whether citizens or foreigners, making no distinction between them, and is equally applicable, therefore, to all the prisoners at the bar. The remaining five counts are framed under the ninth section of the act of congress of April 30, 1790 [1 Stat. 114], which provides:

"That if any citizen shall commit any piracy or robbery aforesaid, or any act of hostility against the United States, or any citizen thereof, upon the high seas, under color of any commission from any foreign prince or state, or on pretence of authority from any person, such offender shall, notwithstanding the pretence of any such authority, be deemed, adjudged, and taken to be a pirate, felon, and robber," and on conviction shall suffer death. These five counts charge that the prisoners are all citizens of the United States, and that they committed the acts set forth in the previous five counts in pretence of authority from one Jefferson Davis. As the provision of the act of congress upon which the last five counts are framed is applicable only to citizens, and not to foreigners, but four of the prisoners can be brought within it, as the other eight are admitted to be foreigners. The four are Baker, Howard, Passalaigue, and Harleston. The distinction between the provisions of the third section of the act of 1820 [3 Stat. 600] and the ninth section of 1790 [supra], and between the counts in the indictment founded upon those respective sections, arises out of a familiar principle of international law, and which is that, in a state of war existing between two nations, either may commission private armed vessels to carry on war against the enemy on the high seas, and the commission will afford protection, even in the judicial tribunals of the enemy, against a charge of the crime of robbery or piracy. Such a commission would be a good defence against an indictment under the third section of [the act of] 1820, by force of the above rule of international law. The ninth section of the act of 1790 changes the rule as it respects citizens of the United States who take service under the commission of the private armed vessels of their country's enemies. It declares, as it respects them, the commission shall not be admitted as a defence; and, as this legislation relates only to our own citizens, and prescribes a rule of action for them, and not as it respects the citizens or subjects of other countries, we do not perceive that any exception can be taken to the act as being unconstitutional or for any other reason. But, upon the view we take of the case, it will not be necessary to trouble you with any remarks in respect to this ninth section, and the several counts framed under it, but we shall confine our observations to a consideration of the third section of the act of 1820. There can be no injustice to the prisoners in thus restricting the examination, as any authority for the perpetration of the acts charged in the indictment will be as available to them, in defence to the counts founded upon the act of 1820, as it would be in defence to those founded upon the act of 1790. Nor can there be any injustice to the prosecution, for, unless the crime of robbery, as prescribed in the 3d section of the act of 1820, is established against

the four prisoners, none could be under the ninth section of the act of 1790. The crime in the two acts is the same for all the purposes of this trial. The only difference is the exclusion of 'a particular defence to charges founded upon the latter. The crime charged is robbery upon an American vessel on the high seas, and hence it is necessary that we should turn our attention to the inquiry,—what constitutes this offence? It has already been determined by the highest authority—the supreme court of the United States—that we must look to the common law for a definition of the term "robbery," as it is to be presumed it was used by congress in the act in that sense, and, taking this rule as our own guide, it will be found that the crime consists in this:—The felonious taking of the goods or property of another of any value from his person, or in · his presence, against his will, by violence, or putting him in fear. The taking must be felonious; that is, taking with a wrongful intent to appropriate the goods of another. It need not be a taking which, if upon the high seas, would amount to piracy, according to the law of nations, or what in some of the books is called general piracy or robbery. This is defined to be a forcible depredation upon property on the high seas without lawful authority, done animo furandi; that is, as defined in this connection, in a spirit and intention of universal hostility. A pirate is said to be one who roves the sea in an armed vessel, without any commission from any sovereign state, on his own authority, and for the purpose of seizing by force and appropriating to himself, without discrimination, every vessel he may meet. For this reason pirates, according to the law of nations, have always been compared to robbers; the only difference being that the sea is the theatre of the operations of one and the land of the other. And, as general robbers and pirates upon the high seas are deemed enemies of the human race,—making war upon all mankind indiscriminately, the crime being one against the universal laws of society,—the vessels of every nation have a right to pursue, seize, and punish them. Now, if it were necessary on the part of the government to bring the crime charged in the present case against the prisoners, within this definition of robbery and piracy, as known to the common law of nations, there would be great difficulty in so doing, upon the evidence, and perhaps upon the counts in the indictment,—certainly upon the evidence. For that shows, if anything, an intent to depredate upon the vessels and property of one nation only,—the United States,—which falls far short of the spirit and intent, as we have seen, that is said to constitute essential elements of the crime

But the robbery charged in this case is that which the act of congress prescribes as a crime, and may be denominated a "statute offence" as contradistinguished from that known to the law of nations. The act, as you have seen, declares the person a pirate, punishable by death, who commits the crime of robbery on the high seas against any ship or vessel, or upon any ship's company, of any ship or vessel, etc., and the interpretation given to these words applies the crime to the case of depredation upon an American vessel or property on the high seas, under circumstances that would constitute robbery, if the offence was committed on land, and which is, according to the language of Blackstone, the felonious and forcible taking from the person of another of goods or money to any value, by violence or putting him in fear. The felonious intent which describes the state of mind as an element of the offence is what is called, in technical language, "animo furandi," which means an intent of gaining by another's loss, or to despoil another of his goods lucri causa, for the sake of gain.

Now, if you are satisfied, upon the evidence, that the prisoners have been guilty of this statute offence of robbery upon the high seas, it is your duty to convict them, though it may fall short of the offence as known to the law of nations. We have stated what constitutes the elements of the crime, and it is your province to apply the facts to them, and thus determine whether or not the crime has been committed. That duty belongs to you, and not to the court. We have said that, in a state of war between two nations, the commission to private armed vessels from either of the belligerents affords a defence, according to the law of nations, in the courts of the enemy, against a charge of robbery or piracy on the high seas, of which they might be guilty, in the absence of such authority. And, under this principle, it has been insisted, by the learned counsel for the prisoners, that the commission of the Confederate States by its president, Davis, to the master and crew of the Savannah, which has been given in evidence, affords such defence. In support of this position, it is claimed that the Confederate States have thrown off the power and authority of the general government; have erected a new and independent government in its place; and have maintained it against the whole military and naval power of the former; and that it is, at least, a government de facto, and entitled to the rights and privileges that belong to a sovereign and independent nation. The right to establish such a government, constitutional or otherwise, has been strongly urged; and the laws of nations, and the commentaries of eminent publicists. have been referred to as justifying the secession or revolt of the Confederate States. Great ability and research have been displayed by the learned counsel for the defence on this branch of the case. But the court do not deem it pertinent, or material, to enter into this wide

field of inquiry. This branch of the defence involves considerations that do not belong to the courts of the country. It involves the determination of great public and political questions, which belong to the departments of our goverment that have charge of our foreign relations,—the legislative and executive departments. When those questions are decided by those departments, the courts follow the decision, and, until those departments have recognized the existence of the new government, the courts of the nation cannot. Until this recognition of the new government, the courts are obliged to regard the ancient state of things as remaining unchanged. This has been the uniform course of decision and practice of the courts of the United States. The revolt of the Spanish colonies of South America, and the new government erected on their separation from the mother country, were acknowledged by an act of congress, on the recommendation of the president, in 1822. Prior to this recognition, and during the existence of the civil war between Spain and her colonies, it was the declared policy of our government to treat both parties as belligerents, entitled, equally, to the rights of asylum and hospitality; and to consider them, in respect to the neutral relation and duties of our government, as equally entitled to the sovereign rights of war as against each other. This was also the doctrine of the courts, which they derived from the policy of the government, following the political departments of the government as it respects our relations with new governments erected on the overthrow of old ones. If this is the rule of the federal courts, in the case of a revolt, and erection of a new government, as it respects foreign nations, much more is the same rule applicable when the question arises in respect to a revolt and the erection of a new government within the limits, and against the authority of the government whose laws we are engaged in administering. And, in this connection, it is proper to say that, as the Confederate States must first be recognized by the political departments of the mother government, namely, the legislative and executive departments, in order to be recognized by the courts of the country, we must look to the acts of those departments as evidence of the fact. The act is the act of the nation, through her constitutional public authorities.

These, gentlemen, are all the observations we deem necessary to submit to you. The case is an interesting one, not only in the principles involved, but to the government and the prisoners at the bar. It has been argued with a research and ability in proportion to its magnitude, in behalf of both the prisoners and the government; and we do not doubt that, with the aid of these arguments, and the instructions of the court, you will be enabled to render an intelligent and just verdict in the case.

2 [The jury retired at twenty minutes after three o'clock. At six o'clock they came into court. Their names were called, and the inquiry made by the clerk whether they had agreed upon their verdict. Their foreman said they had not. One of the prisoners having felt unwell, had been removed from the close air of the court-room, and some little delay occurred until he was brought in. Judge NELSON then said: "We have had a communication from one of the officers in charge of the jury, from the jury, as we understood, though it had no name signed to it. I would inquire whether the note was from the jury?"

[The foreman. "It was."

[NELSON, Circuit Justice. We would prefer that the jurymen, or any of them who may be embarrassed with the difficulties referred to; should himself state the inquiry which he desires to make of the court.

[Mr. Powell, one of the jurors, said that the question was, "whether, if the jury believed that civil war existed, and had been so recognized by the act of our government, or if the jury believe that the intent to commit a robbery did not exist in the minds of the prisoners at the time, it may influence their verdict:"

[After consultation with SHIPMAN, District Judge, NELSON, Circuit Justice, said: As it respects the first inquiry of the juror—whether the government has recognized a state of civil war between the Confederate States and itself—the instruction which the court gave the jury was, that this court could not recognize a state of civil war, or a government of the Confederate States, unless the legislative and executive departments of the government had recognized such a state of things, or the president had, or both; and that the act of recognition was a national act, and that we must look to the acts of these departments of the government as the evidence and for the evidence of the recognition of this state of things, and the only evidence. As it respects the other question—whether or not, if the jury were of opinion, on the evidence, that these prisoners did not intend to commit a robbery on the high seas against the property of the United States, they were guilty of the offence charged—that is a mixed question of law and fact. The court explained to you what constitutes the crime of robbery on the high seas, which was the felonious taking of the property of another upon the high seas by force, by violence, or putting them in fear of bodily injury, which, according to the law, is equivalent to actual force; and that the term "felonious," as interpreted by the law and the courts, was the taking with a wrongful intent to despoil the others of their property. These elements constitute the crime of robbery. Now, it is for you to

---

2 [From the Report of the Trial of Savannah Privateers, 368 et seq.]

take up the facts and decide whether the evidence in the case brings the prisoners within that definition. The court will not encroach upon your province in these respects, but will confine itself to the definition of the law.

[Another of the jury—George H. Hansell—rose and said: One of the jury, not myself, understood your honor to charge that there must be an intent to take the property of another for your own use.

[NELSON, Circuit Justice. No, I did not give that instruction. The jury may withdraw.

[The jury again retired, and, as there was no probability of an agreement at half-past seven o'clock, the court adjourned to eleven o'clock Thursday morning.] [2]

The jury were discharged, without being able to agree on a verdict.

---

[2] [From the Report of the Trial of Savannah Privateers. 368 et seq.]

