### PEDERSEN et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. February 9, 1921.)

No. 87.

1. **Criminal law ⊂⇒114—Jurisdiction of offense committed on high seas is dependent on "district into which offender is first brought."**

The temporary stopping of a vessel on which defendants were held in custody at the quarantine station in the Eastern district of New York *held* not a bringing of defendants into that district, within the meaning of Judicial Code, § 41 (Comp. St. § 1023), providing that "the trial of all offenses committed upon the high seas * * * shall be in the district where the offender is found or into which he is first brought," and the District Court of the Southern District of New York, where defendants were landed and arrested, *held* to have jurisdiction to try them for an offense committed on the high seas.

2. **Criminal law ⊂⇒1170½ (2)—Permitting impeaching questions held harmless error.**

Permitting the prosecution to ask questions of its own witness which tended to discredit or impeach him, but the answers to which were unfavorable to the prosecution, if error, *held* not prejudicial.

3. **Criminal law ⊂⇒393 (2)—Diary of defendant, lawfully obtained by prosecution, admissible in evidence.**

Admission in evidence of a diary kept by one of defendants, which came lawfully into possession of the government, *held* not error.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Criminal law ☞404(3)—Weapons used admissible in evidence.**

> On trial of defendants, as officers of an American vessel, for unlawfully beating, wounding, and imprisoning seamen, clubs, brass knuckles, and knives found in defendants' quarters on the vessel, some of them identified as having been used in the assaults, *held* admissible in evidence.

In Error to the District Court of the United States for the Southern District of New York.

Criminal prosecution by the United States against Adolph Cornelius Pedersen, Leonard Roy Pedersen, and Adolph Eric Pedersen. Judgment of conviction, and defendants bring error. Affirmed.

Dudley Field Malone, Isadore Shapiro, and Edward W. McDonald, all of New York City, for plaintiffs in error.

Francis G. Caffey, U. S. Atty., of New York City (Ben A. Matthews, Asst. U. S. Atty., of New York City, of counsel), for defendant in error.

Before WARD, ROGERS, and MANTON, Circuit Judges.

WARD, Circuit Judge. Adolph C. Pedersen, master of the American barkentine Puako, and his sons, Leonard R. Pedersen, the first mate, and Adolph E. Pedersen, the second mate, were indicted for willfully, knowingly, unlawfully, and feloniously beating and wounding seven members of the crew, and of willfully, knowingly, unlawfully, and feloniously and without justifiable cause imprisoning three members of the crew while the said barkentine was on the high seas in July and August, 1918, and out of the jurisdiction of any particular state of the United States, and within the admiralty and maritime jurisdiction of the United States, on a voyage from Victoria, British Columbia, Canada, to Capetown, South Africa, contrary to the form of section 291, U. S. Criminal Code (Comp. St. § .10464), which reads:

> "Whoever, being the master or officer of a vessel of the United States, on the high seas, or on any other waters within the admiralty and maritime jurisdiction of the United States, beats, wounds, or without justifiable cause, imprisons any of the crew of such vessel, or withholds from them suitable food and nourishment, or inflicts upon them any cruel and unusual punishment, shall be fined not more than one thousand dollars, or imprisoned not more than five years, or both. Nothing herein contained shall be construed to repeal or modify section forty-six hundred and eleven of the Revised Statutes."

Section 41 of the Judicial Code (Comp. St. § 1023) provides for the place of trial in such cases as follows:

> "The trial of all offenses committed upon the high seas, or elsewhere out or the jurisdiction of any particular state or district, shall be in the district where the offender is found, or into which he is first brought."

The cause came on for trial before Judge Mack. All three of the defendants were found guilty of beating Frank Grielen and Jack Jones, being the second and fourth counts of the indictment; the master, of beating James Campbell, the fifth count; the master and first mate, of beating William Jones, the sixth count; the master, of beating Bjarnie Olsen, the seventh count; the master, for imprisoning James

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Campbell, the eighth count. The jury recommended clemency in the case of the mates on account of their age; the first mate being at the time of the trial in September, 1919, 20 years and the second mate 18 years of age.

[1] The first objection of the defendants is that the District Court for the Southern District of New York had no jurisdiction to try them. This depends upon the construction to be given section 41 of the Judicial Code, supra.

October 1, 1918, the United States Consul General at Capetown, discharged the defendants as master and mates of the barkentine, and as they were leaving the consulate they were arrested by the British immigration authorities as prohibited immigrants under Immigration Regulations Act 1913. Thereafter they were taken on a British transport to the naval camp at Rockingham, England, from there to Brest, France, in the United States destroyer Woolsey, and from there to New York on the United States warship Rochester. This steamer stopped at Quarantine without dropping anchor, and after the usual medical examination proceeded to New York City, where the defendants were arrested by the United States marshal for the Southern District of New York.

Quarantine is in Richmond county in the Eastern district of New York. The statute determines the place of trial with reference to things taking place, not upon the high seas, but within a district or districts of the United States. Though in custody on the Rochester, the defendants were not actually arrested until their arrival in the Southern district of New York.

The decision of the Supreme Court in the case of United States v. Arwo, 1 Wall. 486, 22 L. Ed. 67, and of the Circuit Court in the case of United States v. Baker, 5 Bl. 6, Fed. Cas. No. 14,501, show that the temporary stop at Quarantine did not constitute a bringing into the Eastern district of New York. In the Arwo Case the defendant was brought in irons on an American ship to the quarantine anchorage of New York Harbor, in the Eastern district of New York, where she lay for five days. He was then delivered to the harbor police, who took him without process from any court to New York City, where he was delivered to the United States marshal; a warrant for his arrest being thereafter issued. It was contended that he had been first apprehended and first brought into the Eastern district, but the court held that the Southern district of New York had jurisdiction.

In the Baker Case the prisoners were brought into Hampton Roads, in the Eastern district of Virginia, on a United States warship, where after some two days' delay they were transferred to the United States revenue cutter Harriet Lane, which brought them into New York, where they were arrested under judicial process. Judges Nelson and Shipman held that the act gave jurisdiction in the alternative, and that the Southern district of New York, in which they were finally arrested, had jurisdiction to try them.

Section 97 of the Judicial Code (Comp. St. § 1084), which provides that "the District Courts of the Southern and Eastern Districts shall

have concurrent jurisdiction over waters within the counties of New York, Kings, Queens, Nassau, Richmond, and Suffolk, and over all seizures made and all matters done in such waters," has no application to jurisdiction over offenses committed upon the high seas; nothing being done in connection with the offense within the waters in question. The defendants were both found and first brought into the Southern district of New York, and the trial court was right in sustaining the jurisdiction.

[2] The defendants next object that the trial judge erred in permitting the government to impeach its witness Mattson, the ship's carpenter. After his testimony, on direct, defendant's counsel on cross-examination read in evidence an affidavit made by him at Capetown September 12, 1918, which was in several respects inconsistent with his testimony on direct. He insisted, however, that both the affidavit and his testimony were true. Obviously this called for explanation. He was a plain man, not appreciative of distinctions of language, especially in English. The government attempted to show, by reading from the minutes of the grand jury, that he had there given a different account in respect to several statements contained in his affidavit. All this, however, was stricken out by the court, leaving only one or two questions which were asked before recess, to which the witness answered that his testimony before the grand jury was the same as his testimony in court. The situation was eventually solved by the court's reading to the witness the affidavit of September 12, sentence by sentence, asking him to make explanation whenever he wanted to do so. The result of this was to greatly reconcile the testimony on direct and cross-examination. The witness evidently did not appreciate the difference between actual knowledge and hearsay, and he admitted that many of the statements in his affidavit were made upon mere suspicion, and others upon statements made to him by the captain. We think that the government did not impeach the witness, and that the court exercised a wise discretion in admitting the explanations given by the witness.

All that was left of the government's examination of Mattson in connection with his testimony before the grand jury was as follows:

"By Mr. Miller: Q. Mr. Mattson, you have said in response to one of Mr. Malone's questions, this afternoon, that no force and duress was used to compel you to sign this affidavit of September 12th, and also that nobody told you what to say in it; is that correct? A. Yes.

"Q. Do you remember the following questions and answers being asked of you and given by you before the grand jury in March of this year, when you were called there to testify? * * * 'Q. (reading). Was the second mate present? A. The second mate was. Q. Did he tell you what to say? A. He did not tell me then what to say. Q. When did he tell you what to say? A. Well, they told me several things; what to say, and so and so. Q. That was when? A. Well, that was long ago.' * * *

"The Court: * * * What counsel wants to know is whether or not you told the grand jury that you had signed this statement because of fear of the captain or the mates, or because they had told you what to say. Did you tell the grand jury that?

"The Witness: I never told them that, as I know.

"Q. Are you sure that you did not? A. I am sure; I do not remember that I did. * * *

"Mr. Miller: I am reading from the minutes of the grand jury.

"The Court: Ask him specific questions now as to that particular subject.

"Q. I want to ask if he was asked these questions and gave these answers: 'When did he tell you what to say? A. Well, they told me several things what to say, and so and so. Q. When was that? A. Well, long ago. Q. Long before you made this affidavit? A. Yes.'

"The Court: I think we have gone far enough in that.

"Mr. Malone: Your honor has granted me an exception to all of this.

"The Court: Yes. You may submit any authorities on the proposition before the court meets again. You state that you did not make any statements to the grand jury contrary to what you are now swearing to this jury, is that correct?

"The Witness: That is correct.

"The Court: As to that statement made at Capetown?

"The Witness: That is right. * * *

"By Mr. Miller: Q. You testified this morning you were not afraid of the captain, in answer to a question of Mr. Malone. Is that correct? A. I did, yes.

"The Court: Did you testify before the grand jury you were afraid of the captain?

"The Witness: Yes, I believe I did testify that; but I was not. I was never afraid of him.

"Q. Then, Mr. Mattson, you did testify before the grand jury that you were afraid of him. That is correct, isn't it? A. I never did; I don't think I never know anything about that.

"Q. You said in your last sentence that you did? A. I never was afraid of him.

"Q. I am not asking whether you were."

The answers of the witness were unfavorable to the government, and it did not offer in evidence the minutes of the grand jury. If error, it is harmless, and not reversible error.

[3] The next objection of the defendants is that the trial judge erred in permitting the government to offer in evidence the private diary of Adolph E. Pedersen, after he had demanded its return of the United States attorney before the trial. The objection is that in this way he was made to testify against himself as the result of an unlawful seizure of the book, in violation of the Fourth and Fifth Amendments of the Constitution. Weeks v. United States, 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177; Silverthorne Lumber Co. v. United States, 251 U. S. 385, 40 Sup. Ct. 182, 64 L. Ed. 319.

There is some contest whether the return of this particular book was demanded, and whether the order of the District Court, requiring the government to return various books and papers to the defendant, covered it. However, we will assume that the defendant did call for this book, that it fell within the order of the court, that the United States attorney ought to have surrendered it, and refused to do so. There is not the least evidence that the book was seized by the government. On the contrary, it seems quite clear that it, with other papers, was taken from the barkentine by the British authorities, and by them turned over to the United States Consul General and by him forwarded to the Department of State at Washington. Having come in this way into its possession, the government had the right to use it and offer it in evidence in connection with the attitude of the defendant toward the crew.

[4] The finding in the officers' quarters of clubs, brass knuckles, knives, etc., justified offering these things in evidence, because they were consistent with the kind of treatment the members of the crew testified they had received, and were in some cases identified as actually used. We find no merit in various other objections.

The defendants had a fair trial, and the judgment is affirmed.