## The Ambrose Light.

### United States v. The Ambrose Light, etc.

*(District Court, S. D. New York. September 30, 1885.)*

1. PIRACY—DEFINITIONS OF—FELONIOUS INTENT—LAW OF NATIONS.
   "Depredating upon the high seas, without authority from any sovereign power," is piracy by the law of nations. It is not necessary that the motive be plunder, or that the depredations be directed against the vessels of all nations indiscriminately. As in robbery upon land, it is only essential that the spoliation, or intended spoliation, be felonious; *i. e.*, done willfully, with intent to injure, and without legal authority or lawful excuse.
2. SAME—MARITIME WARFARE—FELONIOUS, IF UNLAWFUL.
   As war means and intends spoliation of property and life, if the war be unlawful, the *animus belligerandi* is in the eye of the law felonious; it includes the *animus furandi* in the intentional destruction of life and property.
3. MARITIME WAR THE RIGHT OF SOVEREIGNS ONLY — UNRECOGNIZED REBEL CRUISERS PIRATICAL.
   Maritime warfare, with its incidents of blockade and the right of search, imposes heavy burdens and restrictions upon all commercial nations; in the view of international law it is the right of sovereigns only. Such warfare attempted to be carried on by unrecognized rebels is, in the eye of the law, mere private and unauthorized warfare, and therefore unlawful, and the governments affected have the technical right to suppress it at discretion as piratical.

4. COMMISSIONS BY UNRECOGNIZED REBELS VOID — VESSELS MAY BE SEIZED, THOUGH OFFICERS AND CREW ACQUITTED.

Letters of marque, or a naval commission, issued by rebels who have not obtained recognition of belligerent rights from any sovereign power, are void. Vessels sailing under such commissions, and threatening neutral commerce, may be lawfully suppressed by seizure as technically piratical, though their officers and crews, if they reasonably believed their commissions to be valid, might be acquitted.

5. RECOGNITION OF BELLIGERENCY A POLITICAL, NOT JUDICIAL, ACT — COURTS FOLLOW THE EXECUTIVE.

The recognition of rebel belligerency by other governments clothes insurgents with a *quasi* sovereignty for war purposes, and makes them in the view of courts lawful combatants. Such recognition is the province of the political and executive departments only. Courts must follow, and cannot lead, the executive. Until recognition, the former order of things in foreign states is considered by the courts as continuing; courts have no authority to institute an original inquiry into the conditions of a foreign strife in order to determine whether it should be deemed mere sedition and rebellion, or a technical civil war carrying with it belligerent rights in the rebels.

6. SAME — SEIZURE DISCRETIONARY WITH THE EXECUTIVE — NAVAL REGULATIONS.

In cases of rebellion it is the modern practice for foreign nations to take no notice of the controversy unless their own interests or obligations are affected; but interference or non-interference in such cases is also within the discretion of the political and executive departments; and when a seizure of rebel vessels as piratical is authorized by general naval regulations, or by special instructions from those departments, and the vessel seized is put on trial by the government as prize, it is the duty of the court to sustain the seizure as technically lawful by the strict rule of international law. The subject is at all times within the control of the executive discretion. Numerous authorities referred to,—historical precedents, treaties, the course of diplomacy, the views of statesmen, recent text-writers, and commentators.

7. SAME — RECOGNITION IMPLIED IN OUR DEMAND OF STRICT BLOCKADE.

Recognition of belligerency may be express, as by proclamation; implied by acts of war, such as blockade; or tacit, by acquiescence in the exercise of belligerent rights. A refusal to acquiesce in the decree of a foreign state closing its own ports to commerce by municipal decree, such ports being in possession of armed rebels, unless such decree were also supported by an effective *blockade*, is a recognition by implication of "a state of war," and of mutual belligerent rights, sufficient to prevent subsequent condemnation of rebel vessels as prize.

8. CASE STATED — VESSEL RELEASED — COSTS.

After the burning of Colon by the rebel forces in Colombia, the brigantine A. L., commissioned by the rebels as a Colombian vessel of war, being overhauled and searched by one of our naval squadron, on April 24, 1885, for the purpose of finding Preston, by whose orders Colon was fired, was seized under our naval regulations for not having a proper commission, brought to New York, and libeled by the government for condemnation as prize, under the law of nations, as piratical. Up to the day of seizure the rebels had not obtained recognition from any nation of a state of war or of their belligerent rights from any government; but subsequently, by a letter of the same date, our secretary of state, in reply to a previous notice of the Colombian minister that his government had closed certain rebel ports to commerce, and invited other nations to protect their commerce, which was interfered with by rebel vessels off Cartagena, refused to acquiesce in the Colombian decrees, or to recognize any closure of her ports in possession of the rebels, except by an effective blockade. The proof showed that the brigantine was fitted out to assist in the blockade of Cartagena by the rebels, and in their other military operations on land about that port. *Held*, that in the absence of any recognition of rebel belligerency, or of an existing state of war in Colombia, either by that government or by any other nation, the rebel commission of their own vessel as a vessel of war was, in the eye of international law, unauthorized and void; that the seizure of the vessel as piratical was technically authorized by the law of nations; but that the implied recognition of an existing state of

war, in the secretary's letter of the same date, prevented any condemnation of the vessel; but that as her seizure was lawful at the time, her release should be ordered on the payment of the disbursements of the proceeding.

The libel in this case was filed to procure the condemnation of the brigantine Ambrose Light, which was brought into this port as prize on June 3, 1885, by Lieut. Wright and a prize crew, detached from the United States gun-boat Alliance, under Commander Clarke, by whose orders the brigantine had been seized on the twenty-fourth of April. The seizure was made in the Caribbean sea, about 20 miles to the westward of Cartagena. The commander was looking for the insurgent Preston, by whose orders Colon had shortly before been fired, to the great loss and injury of our citizens. Observing the brigantine displaying a strange flag, viz., a red cross on a white ground, he bore down upon her, and brought her to by a couple of shot across her bows. Before coming to she exhibited the Colombian flag. On examination some 60 armed soldiers were found concealed below her decks, and one cannon was aboard, with a considerable quantity of shot, shell, and ammunition. Preston was not found. Her papers purported to commission her as a Colombian man-of-war, and read as follows: [Translation.]

"I, Pedroa Lara, governor of the province of Barranquilla, in the state of Bolivar, in the United States of Colombia, with full powers conferred by the citizen president of the state, I give to whom it may concern this *patente* of the sailing vessel Ambrose Light, that she may navigate as a Colombian vessel-of-war in the waters touching the coast of this republic, in the Atlantic ocean.

"Therefore, the general commandantes and captains of the vessels-of-war of the friendly nations of Colombia are requested to give this vessel all the consideration that by right belongs to the vessels of the class of the Ambrose Light of all civilized nations. In the faith of which we have given these presents, and signed with rubric with the secretary of my office, in the city of Barranquilla, on the eighteenth day of the month of April, 1885.

[Signed]                                          "PEDROA LARA.
The Secretary, [Sig.] "R. A. DEL VALLE.
(Indorsed:)   "OFFICE OF THE MILITARY,
                              "BARRANQUILLA, April 18, 1885.
"Registered and noted in folio and book, respectively.
      "The General in Chief, N. JUNENO COLLANTE.
      "Adjutant and Secretary, A. SOLANOM."

Believing this commission to be irregular, and to show no lawful authority to cruise as a man-of-war on the high seas, Commander Clarke reported her under seizure, in accordance with the naval regulations, to Admiral Jouett, commanding the North Atlantic squadron then cruising in the Central American waters, and the admiral directed the vessel to be taken to New York for adjudication as prize. The vessel was at first supposed to belong to citizens of the United States. The proofs showed that she had been sold to, and legally belonged to, Colente, one of the chief military leaders of the insurgents at Barranquilla. None of her officers or crew were citizens of the

United States. She was engaged upon a hostile expedition against Cartagena, and designed to assist in the blockade and siege of that port by the rebels against the established government of the United States of Colombia. She had left Sabanilla on April 20th, bound for Baru, near Cartagena, where she expected the soldiers aboard to disembark. She was under the orders of the colonel of the troops, whose instructions were to shoot the captain if disobedient to his orders. Further instructions were to fight any Colombian vessel not showing the white flag with a red cross. Sabanilla, and a few other adjacent sea-ports, and the province of Barranquilla, including the city of Barranquilla, had been for some months previous, and still were, under the control of the insurgents. The proofs did not show that any other depredations or hostilities were intended by the vessel than such as might be incident to the struggle between the insurgents and the government of Colombia, and to the so-called blockade and siege of Cartagena.

As respects any recognition of the insurgents by foreign powers, it did not appear in evidence that up to the time of the seizure of the vessel on April 24, 1885, a state of war had been recognized as existing, or that the insurgents had ever been recognized as a *de facto* government, or as having belligerent rights, either by the Colombian government, or by our own government, or by any other nation. The claimants introduced in evidence a diplomatic note from our secretary of state to the Colombian minister, dated April 24, 1885, which, it was contended, amounted to a recognition by implication of a state of war. The government claimed the forfeiture of the ship as piratical, under the law of nations, because she was not sailing under the authority of any acknowledged power. The claimants contended that, being actually belligerent, she was in no event piratical by the law of nations; but if so, that the subsequent recognition of belligerency by our government by implication entitles her to a release.

*Elihu Root*, U. S. Atty., and *J. P. Clark*, Asst. Atty., for the United States.

*Frank F. Vanderveer*, for claimants.

BROWN, J. The legality of the original seizure of the Ambrose Light depends upon the answer to be given to the inquiry whether the cruise of the vessel under the commission of the insurgent leaders, to assist in the so-called blockade of Cartagena, must be regarded, under the circumstances of this case, as lawful warfare or as piratical. She was owned by one of the insurgents that signed her commission. None of her officers or crew were residents of this country. The question must therefore be adjudged according to the law of nations.

Neither the causes, nor the objects, nor the merits of the revolt are understood by the court; nor is its extent or probability of success known. It is said to be, not for independence, nor for any division of the republic, but rather a personal or party struggle for the possession of the reins of government, such as, unhappily, has too often

arisen in the southern republics. The few ports and provinces that have passed under the control of the insurgents have been acquired, it is said, partly by force of arms and partly by the former loyal officials recognizing the insurgent leaders as their superior officers. But these circumstances, as well as the general merits or demerits of the struggle, are, in the view of the court, wholly immaterial here; because, as will be seen, it is not within the province of this court to inquire into them, or to take any cognizance of them, except in so far as they have been previously recognized by the political or executive department of the government.

The consideration that I have been able to give to the subject leads me to the conclusion that the liability of the vessel to seizure, as piratical, turns wholly upon the question whether the insurgents had or had not obtained any previous recognition of belligerent rights, either from their own government or from the political or executive department of any other nation; and that, in the absence of recognition by any government whatever, the tribunals of other nations must hold such expeditions as this to be technically piratical. This result follows logically and necessarily, both from the definition of piracy in the view of international law, and from a few well-settled principles. Wheaton defines piracy as "the offense of depredating on the high seas without being authorized by any sovereign state, or with commissions from different sovereigns at war with each other." Dana's Wheat. Int. Law, § 122. Rebels who have never obtained recognition from any other power are clearly not a sovereign state in the eye of international law, and their vessels sent out to commit violence on the high seas are therefore piratical within this definition. The general principles of international right and of self-protection lead to the same conclusion. (1) All nations are entitled to the peaceful pursuit of commerce through the ports of all other civilized nations, unobstructed, save by the incidents of lawful war, or by the just restrictions of the sovereign. (2) Maritine warfare, with its burdens and inconveniences to nations not engaged in it, is the lawful prerogative of sovereigns only. Private warfare is unlawful. International law has no place for rebellion; and insurgents have strictly no legal rights, as against other nations, until recognition of belligerent rights is accorded them. (3) Recognition of belligerency, or the accordance of belligerent rights to communities in revolt, belongs solely to the political and executive departments of each government. (4) Courts cannot inquire into the internal condition of foreign communities in order to determine whether a state of civil war, as distinguished from sedition or armed revolt, exists there or not. They must follow the political and executive departments, and recognize only what those departments recognize; and, in the absence of any recognition by them, must regard the former legal conditions as unchanged.

From these principles it necessarily follows that in the absence of recognition by any government of their belligerent rights, insurgents

that send out vessels of war are, in legal contemplation, merely combinations of private persons engaged in unlawful depredations on the high seas; that they are civilly and criminally responsible in the tribunals for all their acts of violence; that in blockading ports which all nations are entitled to enter, they attack the rights of all mankind, and menace with destruction the lives and property of all who resist their unlawful acts; that such acts are therefore piratical, and entitle the ships and tribunals of every nation whose interests are attacked or menaced, to suppress, at their discretion, such unauthorized warfare by the seizure and confiscation of the vessels engaged in it. The right of seizure by other nations arises in such cases, *ex necessitate,* from the very nature of the case. There is no other remedy except open war; and nations are not required to declare *war* against individual rebels whom they are unwilling and are not required to recognize as a belligerent power. Nor are other nations required, for their own security, in such a case, to make any alliance with the parent state. By the right of self-defense, they may simply seize such law-breakers as come in their way and menace them with injury. Without this right, insurgents, though recognition were rightly refused them, and however insignificant their cause, or unworthy their conduct, might violate the rights of all other nations, harass their commerce, and capture or sink their ships with impunity. The whole significance and importance of the doctrine of recognition of belligerency would be gone, since the absence of recognition could be safely disregarded; the distinction between lawful and unlawful war would be practically abolished; and the most unworthy revolt would have the same immunities for acts of violence on the high seas, without any recognition of belligerent rights, as the most justifiable revolt would have with it. The right to treat unlawful and unauthorized warfare as piratical, seems to me, therefore, clearly imbedded in the very roots of international law.

These considerations seem to me sufficient for the determination of this branch of the case. But as the *right* of the government to treat such acts as piratical is vehemently challenged, and as doubt on this point has been expressed by some recent authors, I proceed to consider the subject more in detail.

It should be first observed that the case is not one where recognition of belligerency has been accorded by the parent government, or by any other nation.[1] The question here arises upon the entire absence of recognition anywhere. In this respect the case is unique in modern times. No rebels, so far as I am aware, have ever attempted to blockade ports, and make an attack on the commerce of other nations, without any previous recognition of their belligerent rights. In the case of the late Confederate rebellion, President Lincoln, it will be remembered, treated the revolt almost from the beginning as a

---

[1] The contrary statement in the case of The City of Mexico, 24 Fed. Rep. 34, was based upon the unadvised admission of counsel.

war·waged against the government, and proclaimed a blockade of the southern ports; a measure purely belligerent, and which the supreme court, in the *Prize Cases*, 2 Black, 635, 670, declare "was in itself official and conclusive evidence to the court that a *state of war* existed." See, also, *Coleman* v. *Tennessee*, 97 U. S. 509, 517. The principal maritime nations of Europe, also, made haste to recognize a civil war as existing; to acknowledge the South as a *de facto* government, and to proclaim their neutrality in the contest. Again, in our revolutionary struggle, nearly all the European powers, except Portugal, which was·dominated by English influence, acted in a friendly spirit, and, as *neutrals*, admitting our cruisers freely to their ports, and thus by implication recognizing our belligerency. Lawr. Wheat. note 16, p. 41; Ann. Reg. 1776, pp. *182, *183; Id. 1779, pp. 391, 409, 429. See references in U. S. Messages & Doc. 1861, p. 371. France, as early as 1776, expressly recognized our belligerent rights, and set at liberty a corsair arrested by procurement of the British vice-admiral, (Ann. Reg. 1776; p. 261;) while Portugal alone, by decree of June 4, 1776, refused us recognition, shut her ports to our merchantmen, and denounced confiscation of all our vessels found with contraband goods on board. Id. 260.

In all the revolts and struggles for independence by the Spanisn-American colonies from 1810 to 1822, our government at an early stage of the contest, in every instance, acknowledged the existence of a state of war, and of the belligerent rights of the provinces; maintained an impartial neutrality, and admitted to our ports the vessels of war of each party. Message of Pres. Monroe, March 8, 1822; Note to 4 Wheat. Rep. App. 23–59. It was the same in the Greek revolution, (see Dispatch of Mr. Adams to Rush, Aug. 18, 1823; 2 Elliott, Dip. Code, 633;) and the same in the contest by which Texas acquired her independence of Mexico. Id. 643, 684. Greece blockaded the ports of Turkey; but England had already acknowledged her belligerent rights, and declared her strict neutrality. 2 Stapleton's Life of Canning, 408, 414, 443.

These are among the most prominent revolutionary struggles of recent times. In all of them the revolutionists were speedily recognized as belligerents by foreign powers, long before any recognition of them as independent states. Even England, in her statute of 16 Geo. III., 1776, and in that of 17 Geo. III., 1777, which was renewed annually during the war, and which declared our privateers "pirates," recognized and declared the existence of a *territorial civil war*, whereby we became "enemies" and "belligerents," as well as "rebels." Per NELSON, J., in *Prize Cases*, 2 Black, 694; Lawr. Wheat. note, 79. In the long revolt of the Netherlands, Queen Elizabeth, from policy and religious sympathy, secretly aided the insurgents, and for 20 years, while professing amity with Philip, carried on a secret piratical warfare against him. Hosack, Rise, etc., of Int. Law, 153. The foreign powers generally, says Lawrence, (1 Com de Droit, etc., 186,)

treated the Dutch corsairs as *belligerents*, though Spain regarded them as pirates. Until recognition as belligerents, insurgents have usually carefully abstained from interference with the rights of third powers. No instance has been called to my attention, and I have found none, though such cases may have arisen, in which insurgent leaders have undertaken to blockade ports to the exclusion of the legitimate commerce of all nations, prior to their obtaining any recognition of belligerent rights from abroad. All citations of supposed precedents that omit inquiry into this vital circumstance are likely to prove misleading.

Again, this is a suit *in rem* for the condemnation of the vessel only; not a trial upon a criminal indictment of her officers or crew. The two proceedings are wholly independent, and pursued in different courts. Condemnation of the vessel as piratical does not necessarily imply a criminal liability of her officers or crew. The vessel might be condemned for being engaged upon a piratical expedition only, or for attempts at piratical aggression or restraint. In such a case no indictment for piracy would lie, because criminal punishment is inflicted only according to the municipal law of the captors; and our statutes do not make criminally punishable piratical undertakings or aggressions merely. *The Marianna Flora*, 11 Wheat. 40; *The Palmyra*, 12 Wheat. 1, 15. Even as regards acts that constitute undoubted piracy, there may be valid personal defenses of the officers and crew, as suggested, though not decided, by MARSHALL, C. J., in *U. S.* v. *Klintock*, 5 Wheat. 144, 149. If an owner should forge a commission from a lawful belligerent, and send his vessel out as a privateer under officers and crew who acted in good faith, supposing her commission to be genuine, the vessel should be condemned, though the officers and crew might be acquitted. So if mere usurpers, knowing that they have no recognized authority, should commission their own ships as vessels of war to blockade loyal ports and to threaten the lawful commerce of all nations, and foreign merchantmen were captured or sunk by them during such a blockade, it is possible that the officers and crew might have accepted the commission upon such a reasonable supposition of its coming from an authorized belligerent as to furnish a just defense upon a criminal indictment, though none the less should the vessel and those who commissioned her be held engaged in an illegal and piratical expedition. See *U. S.* v. *Gibert*, 2 Sum. 19. Here the court has to do only with the character and design of the expedition upon which the Ambrose Light was sent out by the insurgents who owned and commissioned her. And, so far as respects the lawfulness of her seizure, the question is the same as if she had actually captured one of our merchantmen, or sunk her and killed the officers and crew while they were lawfully entering the port at Cartagena.

1. Piracy has two aspects: (*a*) As a violation of the common right of nations, punishable under the common law of nations by the seiz-

ure and condemnation of the vessel only, in prize courts; (*b*) its liability to punishment criminally by the municipal law of the place where the offenders are tried. Accordingly, the definitions of piracy, aside from "statutory piracy," fall naturally into two classes, according as the offense is viewed more especially as it affects the rights of nations, or as amenable to criminal punishment under the municipal law. The common-law jurists, and our standard authors on criminal law, define piracy as "robbery on the high seas;" or "such acts of violence or felonious taking on the high seas as upon land would constitute the crime of robbery." 1 Russ. Cr. *144; 1 Bl. Comm. *72; Whart. Crim. Law, § 2830; Sir CHARLES HEDGES, 13 How. St. Tr. 454; Sir L. JENKINS, 13 Petersd. 349, note; Phil. Int. Law, 414. The majority of authors on international law, however, define it substantially as Wheaton defines it, viz., as "the offense of depredating on the high seas without being authorized by any sovereign state; or with commissions from different sovereigns at war with each other." Mann. Int. Law, 160; Hall, Int. Law, 218, and note; Bac. Abr. 163; 2 Browne, Civ. & Adm. Law, 461. See numerous citations to same effect by R. H. Dana, and [now Mr. Justice] GRAY, *Dole* v. *New England Ins. Co.*, 2 Cliff. 394, 400, and note to 5 Wheat. 157.

In several cases in the supreme court pirates are spoken of as synonymous with "persons not lawfully sailing under the flag, or deriving protection from the commission, of any government or nation," (*U. S.* v. *Smith*, 5 Wheat. 153, 163; *U. S.* v. *Holmes*, Id. 412, 417; *The Malek Adhel*, 2 How. 211, 232;) and the other common-law definition is also frequently used.

Prof. Perels, in his recent work on International Maritime Law, (Berlin, 1882, § 16, p. 125,) defines piracy generally in substantially the same terms as Wheaton, giving afterwards some 12 different forms of the offense. Among these are included making captures under a commission after the commission has expired, or after it is revoked; or after knowledge that the war has ended; or outside the proper territorial limits of the war. Piraterie, § 16; Caper, § 34, pp. 186, 187.

Both the above general definitions, in most cases, lead practically to the same results. The latter is equally well established with the former, and is more appropriate in a case of prize. This definition makes piratical, and is intended to make piratical, all private, unauthorized maritime warfare. The reason is that all such warfare is incompatible with the peace and order of the seas, with due security for maritime commerce, or due responsibility for injuries to others. Ocean belligerency embraces the right to arrest, to visit, and to search the vessels of all nations; to seize contraband goods; to blockade ports; and, if need be, to capture or destroy the vessels and crews of all nations that resist or violate the blockade. These are high prerogatives of sovereignty. 3 Phil. Int. Law, (2d Ed.) 474; Lawr. Wheat. pt. 4, c. 1, § 5; Hall, Int. Law, § 178, p. 448; Wools. Int.

Law, § 116. They are neither permitted to mere private persons, or combinations of persons, nor suffered by other nations at their hands. Such private warfare is, therefore, everywhere held unlawful; and, as it involves the infliction of the highest injuries in the destruction of life and property, it is rightly held to be among the highest of crimes, and therefore piracy. There is no other offense that covers it. It is either piracy or no offense at all. To show their right to carry on such warfare, both privateers and public vessels of war are required to be duly commissioned by some proper authority, and to sail under their proper flags. One of the forms of piracy mentioned by Prof. Perels (Int. Mar. Law, § 16, p. 127) is, "ships that sail without any flag, or without a flag sanctioned by any sovereign power; or that usurp a flag, and commit acts of violence under it." And again, "ships that carry on privateering without a commission. Section 34, VIII. p. 185. Accordingly, our statutes authorize both our public vessels of war and our merchantmen to resist and to capture all such vessels. Rev. St. §§ 4294, 4295. Our naval regulations provide, (1876, c. 20, § 18:) "If any vessel shall be taken acting as a vessel of war, or privateer, without having a proper commission so to act, the officers and crew shall be considered as pirates, and treated accordingly." The same are the English naval regulations. Section 1861, Perels, Mar. Law, p. 185. A commission by unrecognized rebels is manifestly not "a proper commission;" and if such vessels, whenever "taken," cannot be detained as piratical, these naval regulations are unlawful.

In the persistent demand made upon the states-general in 1779 by Sir Joseph Yorke, the British minister at the Hague, for the surrender of Paul Jones' prizes, as having been piratically captured, the long practice on this subject was referred to as follows: "All the placards [decrees] of your Mightinesses require that all the captains of foreign armed vessels shall, upon arrival, present their letters of marque, or commissions and authorities, according to the customs of admiralties to treat all those as pirates whose letters are found to be illegal for want of being granted by a sovereign power." Ann. Reg. 1779, p. 430.

The rules above stated are so familiar to seamen that they are seldom violated in recent times except by mutineers, plunderers, or outlaws. In revolutions conducted with discretion, before interrupting the commerce of the seas, such assurances of at least friendly regard from some foreign powers are secured, as shall afford a justification of naval warfare. In our own revolutionary struggle, although Washington, in 1775, employed some armed vessels in the defense of the coast, and for procuring necessary stores and supplies, no public ships of war were sent out by congress, nor were privateers authorized, until the spring of 1776, after assurances of friendly support by France and Spain, and when they had in fact resolved upon render-

ing us large pecuniary aid.  8 Bancroft's History U. S. 114, 136, 215–217, 320–323, 342, 343; 9 Bancroft's History U. S. 63, 134.

2. The recognition by foreign states of a state of war in civil strife, or, what is the same thing, a recognition of the belligerent rights of the insurgents, authorizes courts of law to treat the insurgents as lawful combatants.  In the language of Burke, "it is an intermediate treaty that puts rebels in possession of the law of nations."  It gives them temporarily, and for war purposes, the *status* of an established nation, and all the rights of public war.  On the one hand, it is a concession to rebels in the interest of humanity and expediency.  On the other hand, since recognition of belligerency is not usually accorded till rebellion rises to the dignity of real war, and in its general aspects is fairly entitled to belligerent rights, notwithstanding the burdens it inflicts on other nations, it may be viewed as an adjustment by foreign nations of their own relations, so as to accord with the just requirements of the actual facts.  If recognition be granted, it relieves the parent state from all responsibility for damages for any irregularities or violence committed by the other belligerent.  Had the Ambrose Light sunk one of our merchantmen off Cartagena, we should have had claims for damages against Colombia, in the absence of any recognition of the usurpers; but if they had been recognized by us, Colombia would have been released, and the blockade would have been lawful.

3. Since recognition of belligerency is *pro tanto*, and for war purposes, a recognition of *quasi* sovereignty, and is attended by such important consequences, the power to grant or to withhold it, like recognition of full independence, falls within the exclusive province of the political or executive department.  "No doctrine is better established," says STORY, J., in *Gelston* v. *Hoyt*, 3 Wheat. 246, 324, "than that it belongs exclusively to governments to recognize new states in the revolutions that may occur in the world; and until such recognition, either by our own government or the government to which the new state belonged, courts of justice are bound to consider the ancient state of things as remaining.  This was expressly held in *Rose* v. *Himely*, 4 Cranch, 241, and to that decision on this point we adhere." To the same effect is the language of Chief Justice MARSHALL in *U. S.* v. *Palmer*, 3 Wheat 610, 635.  This is again affirmed in *Kennett* v. *Chambers*, 14 How. 38, where TANEY, C. J., adds, in reference to any inquiry by the courts, in cases of foreign civil strife, whether new states should be recognized or not: "Such an inquiry would be to take on ourselves the exercise of political authority, for which a judicial tribunal is wholly unfit, and which the constitution has conferred exclusively upon another department."  Page 51.  Equally emphatic was the language of Chancellor KENT in *Gelston* v. *Hoyt*, 13 Johns. 561, 587; and similar is the rule of the English law.  *City of Berne* v. *Bank of England*, 9 Ves. Jr. 347; *The Manilla*, Edw. Adm. 1.

Insurgents do not, from the mere fact of revolt, or by their acqui-

sition of a seaport, become entitled to the rights of sovereignty on the high seas, nor to the right of recognition from other nations, whether they will or no. Recognition may rightfully be given or withheld by other nations, according to their views of their own interests, their moral sympathies, their ties of blood, or their treaty obligations; or according to their views of the merits or demerits of the revolt, its extent, or probabilities of success. In the *Case of Smith*, tried for piracy before Mr. Justice Grier in 1861, he said in his charge to the jury:

"But it does not follow that every band of conspirators who may combine for the purpose of rebellion * * * becomes *ipso facto* a separate and independent member of the great family of sovereign states. A successful rebellion may be termed a revolution; but until it has become such it has no claim to be recognized as a member of the family, or exercise the rights or enjoy the privileges consequent on sovereignty." Dana's Wheat. Int. Law, § 21.

In the case of the officers and crew of the Savannah, tried for piracy in 1861, before Mr. Justice Nelson, Mr. Evarts, in his argument for the prosecution, (page 302,) used the following language in reference to a recognition by foreign nations of rebel belligerency:

"Now, what is the duty of other nations in respect to that? Why, their duty and right is this: that they may either accord to these struggling, rebellious, revolted populations the rights of war, so far as to recognize them as belligerents, or not; but whether they will do so or not is a question for their governments, and not for their courts, sitting under and by authority of their governments. For instance, you can readily see that the great nations of the earth, under the influence upon their commerce and their peace which I have mentioned, may very well refuse to tolerate the quarrel as being entitled to the dignity of war. They may say: No, no; we do not see any occasion for this war, or any justice or benefit that is to be promoted by it. We do not see the strength or power that is likely to make it successful, and we will not allow a mere attempt or effort to throw us into the condition of submitting to the disturbance of the peace, or the disturbance of the commerce of the world.' Or they may say: 'We recognize this right of incipient war to raise itself and fairly contend against its previous sovereign,—not necessarily from any sympathy or taking sides in it, but it is none of our affair, and the principles of the controversy do not prevent us from giving to them this recognition of their supposed rights.' Now, when they have done that, they may carry their recognition of right and power as far as they please, and stop where they please. They may say, 'We will tolerate the aggression by public armed vessels on the seas, and our vessels shall yield the right of visitation and search to them.' They may say, 'We will extend it so far as to include the right of private armed vessels, and the rights of war may attend them;' or they may refuse to take this last step, and say, 'We will not tolerate the business of privateering in this quarrel.' And whatever they do or say on that subject their courts of all kinds will follow."

Judge Nelson, in his charge to the jury in the same case, (*U. S.* v. *Baker*, 5 Blatchf. 6, 14,) reiterated the same principle. He says, speaking of the recognition of belligerency:

"It involves the determination of great public and political questions, which belong to the departments of our government that have charge of our foreign relations,—the legislative and executive departments. When those ques-

tions are decided by those departments the courts follow the decision, and until *those departments* have recognized the existence of the new government, the courts of the nation cannot; * * * the courts are obliged to regard the ancient state of things as remaining unchanged."

He then refers to our acknowledgment of the independence of the South American republics, and adds:

"Prior to this recognition, and during the existence of the civil war between Spain and her colonies, it was the declared policy of our government to treat both parties as belligerents, entitled equally to the rights of asylum and hospitality, and to consider them, in respect to the neutral relations and duties of our government, as equally entitled to the sovereign rights of war as against each other. This was also the doctrine of the courts which they derived *from the policy of the government*, following the political department of the government as it respects our relations with new governments erected on the overthrow of old ones."

The practice of our government, in such cases, is stated by President Monroe in his message of March 8, 1822, above referred to. After referring to the natural sympathies of our people with the provinces, he says:'

"As soon as the movement assumed such a steady and consistent form as to make the *success* of the provinces *probable*, the rights to which they were entitled by the law of nations *as equal parties to a civil war* were extended to them. Each party was permitted to enter our ports with its public and private ships, etc. Through the whole of this contest the United States have remained neutral."

4. In the absence of any recognition by foreign powers, or by our own government, it is clear from the above authorities that the court has no power to institute any inquiries into the *status* of insurgents in foreign countries, or to attempt to determine, or to lead the political department in determining, whether or not there be a state of actual "open war;" whether the parties are "enemies" or "belligerents;" or whether the condition is that of armed rebellion merely. It is not necessary to consider whether, in a case where there has been notorious civil war for a considerable period, and where the parent government has itself recognized a state of war, or where other foreign nations have done so, and where the government in whose courts the cause arises has taken no negative action, but has tacitly adapted itself to the situation as one of war, the court might not hold such circumstances to amount to a tacit recognition of belligerency by its own government. Nothing of that kind exists here. Until some recognition by the political department, express, implied, or tacit, of new conditions in foreign states, there is no "open war," no "belligerent;" there are no "enemies" that the court can recognize, but only insurgents. Under such circumstances no legal validity can be allowed in courts of law to the commissions given by such insurgents. In the case of *U. S.* v. *Klintock*, 5 Wheat. 144, on an indictment for piracy committed in 1818, it appeared that the privateer sailed under a *commission* from one Aury. Chief Justice MARSHALL said, (page 149:)

"So far as this court can take any cognizance of that fact, Aury can have no power, either as a brigadier of the Mexican republic,—*a republic of whose existence we know nothing,*—or as generalissimo of the Floridas, a province in the possession of Spain, to issue commissions to authorize private or public vessels to make captures at sea."

In the case of *Dimond* v. *Petit*, 2 La. Ann. 537, (1847,) EUSTIS, C. J., says:

"This capture was made under color of an insurgent military authority at Campeachy, in the Mexican province of Yucatan. We directed the attention of counsel to the necessity of furnishing the court with information as to the course taken by the government of the United States in relation to the belligerent rights of the province of Yucatan, which is said to have been in a state of rebellion against the republic of Mexico at the time of the capture. No justification has been exhibited to us for this outrage upon our flag, and the capture can be viewed in no other light by the court than as an act of *lawless* depredation. It is well settled that the proceedings of courts in cases of this kind depend entirely on the action of the general government. There being no evidence that a state of war was recognized by our government as existing between this insurgent power and Mexico, the rights of the former as a belligerent cannot be admitted by this court."

In *U. S.* v. *Greathouse*, 2 Abb. (U. S.) 364, 380, Mr. Justice FIELD said:

"The courts * * * cannot treat any new government as having authority to issue commissions or letters of marque, which will afford protection to its citizens, until the legislative and executive departments have recognized its existence. The judiciary follows the political department of the government in these particulars."

It follows that in the absence of any recognition by our government of an existing civil war in Colombia, the commission executed by the insurgents to their own vessel to carry on maritime war, and to blockade Cartagena, has no validity that this court can recognize. Her depredations, or intended depredations, in preventing other nations from pursuing lawful commerce with Cartagena, must be viewed by the court as the acts of mere private, unauthorized persons. The commission is void, and as no commission. The vessel derives no protection from it, and must be held piratical, as she would be held if cruising for similar purposes without any commission at all. In addition to this, there was also the fraudulent exhibition of the Colombian flag when approached by the Alliance; a flag to which the Ambrose Light clearly had no color of right, since the rebels had no color of claim to constitute the established government of the republic of Colombia, but were mere usurpers.

5. But it is urged that her cruise, to be held piratical, must have been such in intent, and that an intent that, like this, is simply belligerent, is not piratical; and that on two grounds: *First*, because a belligerent vessel is directed against the ships or property of one nation only; and, *second*, because her acts are not done *animo furandi*, for the sake of plunder, but as acts of war only, *animo belligerandi*.

It is curious to notice that, in the case of the privateers commis-

sioned by the deposed King James II., the same objections here taken were urged before the privy council against any conviction for piracy. The judges, it is said, smiled, and asked counsel "whether there was ever any such thing as a pirate, if none could be a pirate but he that was actually in war with all mankind." *Hostis humani generis*, it was said, is "neither a definition, nor so much as a description, of a pirate, but a rhetorical invective to show the odiousness of the crime." As regards the *intent*, and the excuse furnished by King James' commission, it was asked whether such a commission could excuse a forcible taking of goods on land from the guilt of robbery; and, if not, why any more excuse piracy; and that "piracy was nothing but seizing ships and goods by no commission, or, what was all one, by a void or null one. Their pretending to believe that he [the king] has still a right, is no more excuse in the case of piracy than of treason, which every traitor may pretend to." See a full account of this interesting case in 1 Phil. Int. Law, 428. Phillimore concedes that the privateers in that case were rightly adjudged pirates, *jure gentium*. Id. 436.

This case, in principle, covers the whole ground of the objections here urged; for those privateers intended warfare only, and warfare under the king's commission, and against England only. The king, being deposed, was indeed but a titular king, without possessions; but this only served to make his commissions unlawful and invalid, and that is the case with the commissions of the insurgents here. The question of the legal consequences of the invalidity of the commissions is the same in both cases. So, in *Dole* v. *New England Ins. Co.*, 2 Cliff. 394, 420, CLIFFORD, J., says that the Confederate commission "would be utterly null and void as an answer to an indictment for an offense against our municipal criminal law," [*i. e.*, against piracy.] But a *felonious* intent is as necessary to conviction under our municipal law as under the law of nations. The only remaining question is evidently the validity of the commission for war purposes, and that depends wholly on recognition of belligerency.

The objections here urged, it must be observed, challenge, not merely the right to regard unrecognized belligerents on the high seas as pirates, but the right to regard them as guilty of any offense at all. The excuse, if good for anything, applies equally to any form of crime that might be charged. In other words, if these objections be sound, the public vessels of all nations must stand silently by and see their merchant ships seized while engaged in lawful commerce, or sunk, if they resist, and their officers and crews slaughtered with impunity, by rebels who are refused recognition as lawful combatants. It would seem plain enough that the "law of nations," which is chiefly but an expansion of the common right of self-protection among co-equal sovereignties, could admit of no such impotent conclusion as that. If nations are unwilling to recognize insurgents as lawful combatants on the high seas, they must, of necessity, and for self-preservation,

have the *right* to seize and suppress insurgent vessels that, in spite of non-recognition, insist upon committing violence on vessels of other nations under the name of war. Otherwise, their rights are prostrated before mere usurpers, and the so-called recognition of belligerency becomes a mere useless form. Thus, when the sea becomes the theater of operations, and ports are blockaded, there is no alternative, as we shall find all publicists and diplomatists agree, but to treat the rebel cruisers either as belligerents or as piratical. Such seizures might, it is true, invite retaliation from the insurgents, and lead to irregular, or, ultimately, even to open war, if the insurgents had sufficient force to carry on such a struggle. But this is a consideration addressed solely to the political and executive departments, which, it is presumed, will take all such contingencies into account in determining their course. It does not affect their legal rights.

The objections named are really drawn from the usual definition of piracy, viewed as a crime, viz., as "robbery upon the high seas," coupled with a further description of the offense as committed in "a spirit and intention of universal hostility," which has been occasionally employed in describing the *practice* of general pirates, rather than the essential elements of piracy itself. 1 Kent, *183, *184; *Davison* v. *Sealskins*, 2 Paine, 333; per NELSON, J., in *Case of Crew of the Savannah, sub nom. U. S.* v. *Baker*, 5 Blatchf. 6–10. But though indiscriminate depredations are mentioned, it is added: "It is the same offense with *robbery* on land;" which shows that "the spirit and intention of universal hostility" is mere embellishment, and no part of the legal definition.

No doubt indiscriminate violence and robbery on the high seas are piracy, (*U. S.* v. *Smith*, 5 Wheat. 153, 161;) but it is doubtful whether any pirates ever really practiced, or intended to practice, wholly indiscriminate robbery upon all vessels alike; and it is far from true that no acts are piratical by the law of nations except such as are of that description, or even except such as have a specific *animus furandi, lucri causa*. Of this last point Judge STORY says, in the case of *U. S.* v. *The Malek Adhel*, 2 How. 211, 232:

"If he willfully sinks or destroys an innocent merchant ship without any other object than to gratify his lawless appetite for mischief, it is just as much piratical aggression, in the sense of the law of nations and of the act of congress, as if he did it solely and exclusively for the sake of plunder, *lucri causa*. The law looks at it as an act of hostility, and being committed by a *vessel not commissioned and engaged in lawful warfare*, it treats it as *the act of a pirate*, and of one who is emphatically *hostis humani generis*."

To the same effect see Dana's Wheat. notes 15, 83, 84; Hall, Int. Law, § 81, pp. 215, 216. As regards the "intent of universal hostility," Dr. LUSHINGTON, in the case of *The Magellan Pirates*, 1 Phil. Int. Law, 498–502, said:

"All persons are held to be pirates who are found guilty of piratical acts; and piratical acts are robbery and murder upon the high seas. * * *. It

was never deemed necessary to inquire whether the parties so convicted had intended to rob or to murder on the high seas indiscriminately."

In the case of *U. S.* v. *Ross*, 1 Gall. 624, some Portűguese convicts at the island of St. Jago, in order to regain their liberty, had seized an American schooner and run away with her, and in carrying out their design had killed one of the persons on board. Judge STORY said, (page 629:) "It was a clear case of piracy at common law." See, also, *In re Tivnan*, 5 Best. & S. 645; *infra*, p. 430. So, if mariners feloniously rise against the master and run away with the ship, this is piratical at common law as well as by statute. Molloy, De Jur. Marit. *c.* 4; *U. S.* v. *Tully*, 1 Gall. 247, 252, 255; 13 State Trials, 395, 454; *The Magellan Pirates, supra.* Yet in neither of these classes of cases is there any intent of universal hostility, nor are the offenders *hostes humani generis*, except in a general sense signifying a willful disregard of the essential order and welfare of human society, such as characterizes all other high crimes. In this sense Lord HALE speaks of murderers as *hostes humani generis*. "When one voluntarily kills another without any provocation it is murder, for the law *presumes* it to be *malicious*, and that he is *hostis humani generis*." 1 Hale, P. C. 455. In the present case, however, the specific mission of the Ambrose Light to "blockade" Cartagena was in itself a menace and an unlawful aggression against the ships of all nations.

The "intention of universal hostility," in any special sense, is applicable to pirates by profession only; to those who make piracy a business, and live by some approach to indiscriminate plunder, and who in that sense are "general pirates." In other words, it is a description of the supposed practice of one *class* of pirates only; just as the *animus furandi* is descriptive of the particular *motive* of most piracies. But neither the general intent in the one case, nor the particular and common motive of plunder in the other, is necessary or essential to the offense of piracy itself. And it is manifest that the offense may be as complete, though but a single act be committed or intended, as if such acts were practiced as a business, and indiscriminately on all vessels, to procure a livelihood.

Upon an indictment under the United States Statutes of the officers and crew of the rebel cruiser Savannah, in 1861, Mr. Justice NELSON, incidentally referring to piracy by the law of the nations, says:

"This is defined to be a forcible depredation upon property on the high seas without lawful authority, done *animo furandi;* that is, as defined in this connection, in a spirit and intention of universal hostility. A pirate *is said to be* one who roves the sea in an armed vessel, without any commission from any sovereign state, on his own authority, and for the purpose of seizing by force and appropriating to himself, without discrimination, every vessel he may meet. For this reason pirates, according to the law of nations, have always been compared to robbers, *the only difference being that the sea is the theater of the operations of one, and the land of the other.* * * * Now, if it were necessary on the part of the government to bring the crime charged in the present case against the prisoners within the definition of robbery and piracy, as known to the common law of nations, there would be

great difficulty in so doing upon the evidence, and, perhaps, upon the counts in the indictment; certainly upon the evidence, for that shows, if anything, an intent to depredate upon the vessels and property of one nation only—the United States—which falls far short of the spirit and intent, as we have seen, that are *said* to constitute essential elements of the crime. But the robbery charged in this case is that which the act of congress prescribes as a crime, and may be denominated *a statute offense*, as *contradistinguished* from that known to the law of nations." *U. S.* v. *Baker*, 5 Blatchf. 6, 11, 12.

This passage embodies the objections urged in the present case. From the last sentence quoted, however, it is clear that in the view of Mr. Justice NELSON the case on trial before him was a statute offense only, and that no careful consideration of the nature of piracy by the law of nations was called for. His observations on that offense are therefore *obiter*, and cannot be deemed to have been carefully considered, nor intended to be made strictly accurate, there being no occasion to make them so. Carefully observed, it will be noticed that his remarks do not purport to express so much his own views as what *is said* to constitute general piracy by the law of nations; and we are not here considering general piracy, or the practices of general pirates. From what has been said before, it is evident that the above description of piracy, though applicable to pirates by profession, is not accurate as a definition, or as a test in isolated cases. The different and inconsistent forms of expression used in the passage quoted, as in similar passages in 1 Kent, *184, and in *Davison* v. *Sealskins*, *supra*, refute the objections and the inferences which might otherwise be drawn from them. Comparing piracy with robbery on land, it is said "the only difference is that the sea is the theater of the operations of the one, and the land of the other," which obviously neutralizes the restrictions in the definition previously stated, since no such restrictions apply to robbery on land. If A. should waylay B. and violently despoil him of his purse, no one would doubt that the act was robbery, though A. immediately threw the purse into the sea, and had no motive of pecuniary gain, *lucri causa*, but acted from revenge only, and meditated no other offense against B. or any other person.

The charge to the jury in that case, moreover, in its general drift and purport is opposed to the views of Mr. Justice CLIFFORD, as expressed in *Dole* v. *New England Ins. Co.*, *supra*, and to the charge of Mr. Justice GRIER, on the trial of William Smith and others, under the same statutes, for similar acts, very shortly before, who ruled that the court was bound to hold the accused to be pirates. The latter's general views of the relation of the government to its own citizens was sustained by a majority of the supreme court in the *Prize Cases*, 2 Black, 635. This decision included the case of *The Amy Warwick*, and affirmed, as respects that vessel, the decree of Judge SPRAGUE, (2 Spr. 123,) who had declared her liable to be adjudged a pirate. Id. 132.

As respects intent, the question is the same in piracy as in all other crimes, where the intent is material. All that is requisite to be shown

is that the act is felonious. It is so stated by THOMPSON, J., in *Davison* v. *Sealskins*, 2 Paine, 332; by STORY and DAVIS, JJ., in *U. S.* v. *Tully*, 1 Gall. 252, 255; *Dole* v. *Insurance Co.*, 51 Me. 465. A *felonious* intent in the criminal law, like *malice*, means "the willful doing of an injurious act without lawful excuse." Per SHAW, C. J., in *York's Case*, 9 Metc. 93, 104; per BLACKBURN, J., in *Queen* v. *Ward*, 12 Cox, Crim. Cas. 123; *People* v. *Clark*, 7 N. Y. 393; *U. S.* v. *Outerbridge*, 5 Sawy. 620, 622. It is the same in robbery on land, or spoliation with "wrongful intent." Per NELSON, J., *U. S.* v. *Baker*, 5 Blatchf. 6, 11. It is never necessary to show that the accused knew or thought that what he was doing was a crime. *U. S.* v. *Baldridge*, 11 Fed. Rep. 552, 554. Very often, through the heat of passion, through thought-lessness, or through ignorance of the law, the fact is otherwise. But though these circumstances may mitigate the grade of an offense, they never justify it. *Ignorantia legis neminem excusat* is a familiar maxim; meaning, practically, not that every man is presumed actually to know the law, but that ignorance of the law shall not be admitted to excuse crime, or the breach of contracts. Per BLACKBURN, J., *Queen* v. *Mayor, etc.*, L. R. 3 Q. B. 629, 635.

In the case of *Reynolds* v. *U. S.*, 98 U. S. 145, the supreme court held that the accused's belief that polygamy was a religious duty was no defense on an indictment for bigamy. The court say, (page 167:)

"A criminal intent is generally an element of crime, but every man is presumed to intend the necessary and legitimate consequences of what he knowingly does. Here the accused knew he had been once married, and that his first wife was living. He also knew that his second marriage was forbidden by law. When, therefore, he married the second time, he is presumed to have intended to break the law. And the breaking of the law is the crime. Every act necessary to constitute the crime was knowingly done, and the crime was therefore knowingly committed. Ignorance of a fact may sometimes be taken as evidence of a want of criminal intent, but not ignorance of the law. The only defense of the accused in this case is his belief that the law ought not to have been enacted. It matters not that his belief was a part of his professed religion; it was still belief, and belief only."

So, in *U. S.* v. *Anthony*, 11 Blatchf. 200, it appeared that Miss Anthony had voted under a claim of a constitutional and legal right to vote, and was indicted for so doing under the act of congress that imposed fine or imprisonment on any person who shall "knowingly * * * vote, without having a lawful right to vote." Mr. Justice HUNT says:

"If she believed she had a right to vote, and voted in reliance upon that belief, does that relieve her from the penalty? * * * Two principles apply here: *First*, ignorance of the law excuses no one; *second*, every person is presumed to understand and to intend the necessary effects of his own acts. * * * There was no ignorance of any fact, but, all the facts being known, she undertook to settle a principle in her own person. She takes the risk, and she cannot escape the consequences. It is said, and authorities are cited to sustain the position, that there can be no crime unless there is a culpable

intent, and that, to render one criminally responsible, a vicious will must be present. A. commits a trespass on the land of B., and B., thinking and believing that he has a right to shoot an intruder upon his premises, kills A. on the spot. Does B.'s misapprehension of his rights justify his act? Would a judge be justified in charging the jury that, if satisfied that B. supposed he had a right to shoot A., he was justified, and they should find a verdict of not guilty? No judge would make such a charge. To constitute a crime, it is true there must be a criminal intent; but it is equally true that knowledge of the facts of the case is always held to supply this intent. An intentional killing bears with it evidence of malice in law. Whoever, without justifiable cause, intentionally kills his neighbor, is guilty of a crime. The principle is the same in the case before us, and in all criminal cases." See *U. S.* v. *Taintor*, 11 Blatchf. 374; *Regina* v. *Downes*, 1 Q. B. Div. 25, 30.

So in the indictment of Dorr for treason, his plea of no criminal intent, but of an honest belief that he was the lawful governor of Rhode Island, was held untenable. See Pittman's Dorr's Trial; Whart. Am. Crim. Law, 786–790.

To constitute a criminal offense, it is only necessary to show, therefore, that the accused committed intentionally, with design to injure another, and without legal excuse, an act which the law makes criminal. 3 Greenl. Ev. §§ 1, 13, 20. The law of nations necessarily makes unlawful the capture or destruction of ships by a vessel sailing without any commission, or without a lawful commission from some recognized power, as well as a capture under a usurped flag. Such captures, considered by themselves, are acts of spoliation and robbery; and when committed knowingly, with intent to injure, and without lawful authority, they are felonious, and therefore piratical, even in its criminal aspect. That such spoliation and capture are done under the name of war, cannot furnish a legal defense, if the court cannot recognize the warfare as *lawful*. The *animus belligerandi*, if unlawful, becomes *animus furandi*, and more; as the greater includes the less. War means and intends the destruction of life and property. Such destruction is lawful, if the war be lawful; if it is not lawful, the intent to despoil of life and property remains the same; but as the legal excuse for it fails, the intent then becomes in law felonious, and hence the act is punishable as criminal. See 10 Amer. Jur. 265–267. The law never admits the ultimate object or motive to be a justification, where the means are unlawful. Per COCKBURN, C. J., and BLACKBURN, J., in *Reg.* v. *Recorder of Wolverhampton*, 18 Law T. 395, 397, 398.

Again, a felonious intent is as necessary to constitute treason as to constitute piracy. Rebellion, whether conducted on land or sea, is felonious and treasonable, and punishable with death by the parent state. Our history furnishes numerous instances, (Whart. Am. Law, "Treason," 771–790,) and Riel's case is a current instance. The same acts upon the high seas, if not recognized as lawful war, must be equally felonious in law, as respects other nations injured thereby, and as such liable to be treated as piratical.

That a *belligerent intent* is no defense, provided the acts, or the ves-

sel's commission, be unlawful, is further illustrated in one of the recognized forms of piracy stated by Prof. Perels (section 34, VIII. 6, p. 181) as follows: "Persons who, contrary to a prohibition of their own government, practice privateering under a foreign authority, may be treated as pirates by all governments save that which issued the commission." He refers to the French ordinance of 1681 (III. 9, art. 3) to that effect; and he adds: "The newer view answers perfectly to this rule, which has even found expression in several treaties." 2 Valin, Ord. Mar. 235. In 1861 the proclamations of Belgium and of the Netherlands and of other states announced explicitly that their subjects violating such a prohibition would be liable to be treated as *pirates* abroad as well as at home, (see Barnard, Neutrality, 145, 146; Perels, 189;) and this upon the ground that such commissions were no longer to be deemed valid or lawful. Numerous treaties are to the same effect. 1 Kent, *100, and Hall, Int. Law, 220-222, notes.

The insurgent leaders, in sending out the Ambrose Light to blockade Cartagena, were, so far as this court can recognize, in the position of seeking some political revolution or usurpation by means that were unlawful as respects foreign nations. They could not, by merely commissioning their own vessels, without any recognition by the executive or political departments of any other government, make themselves lawful belligerents, or become entitled to exercise acts of constraint or of violence towards the vessels of other nations. They knew that, with this lack of legal authority, they took the risk of having the vessel treated as piratical. They knew that, until recognition, their position in the courts, both at home and abroad, was that of mere usurpers who, in addition to treason against their own country, were threatening, by their attempted blockade, the lives and property of the subjects of all other commercial nations. They took all the risks of being treated as criminals, or as piratical cruisers, until they secured recognition of belligerent rights from abroad.

6. That recognition by at least some established government of a "state of war," or of the belligerent rights of insurgents, is necessary to prevent their cruisers from being held legally piratical by the courts of other nations injuriously affected, is either directly affirmed, or necessarily implied from many adjudged cases; and I have found no adjudication in which a contrary view is even intimated.

I have already referred to the case of *U. S.* v. *Klintock*, 5 Wheat. 144, in which it was held that the court could not recognize any validity in a commission from the unknown "Mexican Republic."

The case of *U. S.* v. *Palmer*, 3 Wheat. 610, arose upon alleged acts of piracy committed in 1817 under a commission from revolutionists carrying on a struggle for independence against Spain, who had already been acknowledged by our government as belligerents. In response to a certificate of division from the circuit court upon the question whether the cruise was piratical, MARSHALL, C. J., said: "If the government of the Union remains neutral, *but recognizes the*

*existence of a civil war*, [which imports belligerents and belligerent rights,] its courts cannot consider as criminal those acts of hostility which war authorizes," (pages 635, 644,) and such was the certificate of the court. The clause in italics is the more significant in that case, because the certificate of division from the circuit, though reciting all the other circumstances of the rebellion, its new *de facto* government, and its independence as not established, did not allude to the fact that recognition of belligerency had been previously accorded by our government, though it mentioned the fact of a civil war. The answer of the supreme court turned wholly on the recognition of belligerency by our government. The same principle was again applied, and the decision based entirely upon our previous recognition of belligerent rights in the revolting colonies of Spain, in the cases of *The Divina Pastora*, 4 Wheat. 52, 63, and *The Neustra Senora de la Caridad*, Id. 497, 502. The same principle was again declared in *The Santissima Trinidad*, 7 Wheat. 283, 337; but in the case of *The Nueva Anna*, 6 Wheat. 193, where the existence of "a state of war" had *not* been recognized, it was held that the condemnation of prize at Galveston in 1821 was wholly void.

The case of *The Invincible and the Pocket* very closely resembles the present, except in the single circumstance of the previous recognition of the belligerency of Texas by our government. 3 Op. Attys. Gen. 120. In that case, during the struggle between Mexico and Texas, the Invincible, an armed cruiser of Texas, had seized the Pocket for carrying contraband goods to Mexico. On the complaint of insurers, a United States vessel had seized the Invincible as a pirate, and brought her, with her crew, into New Orleans for trial and adjudication. On reference of the matter to Attorney General Butler, for decision whether they were liable for piracy or not, he says:

"Where a civil war breaks out in a foreign nation, and part of such nation erect a distinct and separate government, and the United States, though they do not acknowledge the independence of the new government, *do yet recognize the existence of a civil war*, our courts have uniformly regarded each party as a belligerent nation in regard to acts done *jure belli*. * * * The existence of a civil war between the people of Texas and the authorities and people of the other Mexican states was *recognized* by the president of the United States at an early day in the month of November last. Official notice of this fact, and of the president's intention to preserve the *neutrality* of the United States, was soon after given to the Mexican government. This recognition has been since repeated by numerous acts of the executive, several of which had taken place before the capture of the Pocket."

The vessel and crew were accordingly released. See, also, *Dimond* v. *Pelit, supra*, p. 421. The case of *The Georgiana*, 9 Op. Attys. Gen. 140. The tribunal at Marseilles, in 1823, refused to adjudge a rebel South American cruiser as a pirate; but that was long after belligerent rights had been expressly accorded the colonies by this country, and impliedly by Spain herself, through her treaty with England stipulating for the latter's *neutrality*. See *infra*, p. 438. The

Huascar, in 1877, with the Peruvian insurgent Pierola and his band on board, was attempting to keep up operations against Peru, and had done some violence to British shipping. She was attacked by a British admiral, but eluded capture by running into shallow water. Sir W. HARCOURT said:

"In strictness they were pirates, and might have been treated as such; but it was one thing to assert that they had been guilty of acts of piracy, and another to advise that they should be tried for their lives and hanged at Newgate." Boyd, Int. Law, 172.

In the *Case of Tivnan*, 5 Best & S. 645, where some persons had come on board the American schooner Joseph E. Gerrity, in November, 1863, at Matamoras, and afterwards, upon the high seas, had violently seized her in the name of the Confederacy and set the master and officers adrift, the act was held by all the judges to be *prima facie* an act of piracy, and not an act of war. Pages 684, 689, 696. BLACKBURN, J., at the close of his opinion, clearly intimates that any defense of the act as a possible act of war, was dependent upon previous recognition of belligerency. He says:

"But, looking at the evidence, what was done by the prisoners is either taking the ship for plunder, which would be piracy, *jure gentium*, in which case there is no power vested in us by statute to give them up, or an act of war, and consequently not triable anywhere. For, although the Confederate States are not recognized as an existing power, yet they *are* [recognized] *as belligerents.*"

From all these cases the implication is very strong that, in the absence of any recognition of belligerent rights by the political or executive branches of any government, the cases would have been deemed cases of piracy by the law of nations, as that of the Huascar was declared to be.

The burning of the Golden Rocket by the rebel cruiser Sumpter, in July, 1861, gave rise to several suits upon policies of insurance which had insured against "pirates;" but, by a marginal indorsement, excepted losses by capture. The causes were heard in the supreme courts of the states of Maine, Massachusetts, and Pennsylvania, in the circuit court of Massachusetts, and in the United States supreme court. In all it was held that the loss was by capture, and that upon that ground the insurance companies were not liable. In the case in Maine, (*Dole* v. *Insurance Co.*, 51 Me. 465,) DAVIS, J., delivering the opinion, held the case piracy also. In the circuit court, (*Dole* v. *Insurance Co.*, 2 Cliff. 394,) CLIFFORD, J., held it not piracy within the meaning of a commercial document issued before the war broke out. And the same view is intimated in *Dole* v. *Insurance Co.*, 6 Allen, 373, 392. In *Fifield* v. *Insurance Co.*, 47 Pa. St. 166, the views of the different judges were quite diverse; the majority regarded the act of the Sumpter as a belligerent capture, under the president's mode of treatment of the case. In the supreme court, (*Mauran* v. *Insurance Co.*, 6 Wall. 1,) the case, as in the other courts, was exhaust-

ively argued in both of its aspects, by Messrs. Dana, Gray, and Caleb Cushing, on one side, and Messrs. B. R. Curtis and Storrow, on the other. In that argument I find one point on each side, touching the question here discussed, that seems to me an exact statement of the law. The latter say, (page 7:)

"No authority can be produced to show that a capture under a commission issued by a *regularly organized de facto government*, engaged in *open and actual war*, to cruise against its *enemy*, and against its *enemy* only, is piracy, under the laws of nations."

This is true, when that state of things can be recognized by the court; but no foreign court has authority to treat revolters as a "regularly organized *de facto* government," or to recognize "open and actual war," or the parent government as an "enemy," in advance of the action of the political or executive department. In that case recognition of the Confederates had already become general at home and abroad. The plaintiff's point in the same case is equally true:

"Looking to all the conditions of the rebellion, cruising by rebels who are as yet *unacknowledged by anybody*, even as a *de facto* government, would be cruising without being authorized by any sovereign, and so would be piracy by the law of nations." Page 4.

Both sides, it will be observed, either expressly or by implication, made the legal situation depend upon previous recognition of belligerency. So, in the treatment of the case by CLIFFORD, J., the previous recognition of belligerency, not by foreign powers only, but by the United States itself, is manifestly made the turning point, (2 Cliff. 420–425;) and in 6 Allen, 392, the supreme court of Massachusetts adverted to the fact that the rebel cruisers had been recognized abroad as "entitled to the privileges of a belligerent power." In the opinion of the supreme court, the question of "capture" only was considered, and the south was held to constitute such a *de facto* ruling power as to make the case one of technical "capture," and therefore within the exception of the policy. So, too, in various cases that have arisen in our courts out of violent acts on land during the late rebellion; though there is some difference of opinion whether the rebels had any good legal defense for such acts done in course of war, yet the authorities that hold the affirmative rest the defense upon the recognition of belligerency. Thus, in *Smith* v. *Brazelton*, 1 Heisk. 44, it is said: "But homicide, by any person forming part of a belligerent army, *recognized as such*, is not murder, when committed in due course of war." See Whart. Crim. Law, §§ 283, 1866; Whart. Hom. § 13, note; *Gunter* v. *Patton*, 2 Heisk. 261; *U. S.* v. *Greathouse*, 2 Abb. (U. S.) 364; *U. S.* v. *Hutchings*, 2 Wheeler, Crim. Cas. 543, 546; Whiting, War Powers, note to 43d Ed. p. 391, (1870.) See *Hickman* v. *Jones*, 9 Wall. 197; *The Amy Warwick*, 2 Spr. 132. But killing even an alien enemy, unless such killing is in the actual exercise of war, would be murder. 1 Hale, 433; *State, etc.*, v. *Gut*, 13 Minn. 341, (Gil. 315.)

7. The same doctrine is directly stated by several recent commentators and publicists. I have already referred to the definitions and descriptions of piracy given by Prof. Perels, which clearly include cases like the present. Manning, Int. Law, p. 160, says:

"Whether rebels can or cannot be treated as pirates, must depend (1) upon the amount of *recognition* for *belligerent purposes* they receive abroad; and (2) upon their treatment by the parent state."

Dana, in his notes to Wheaton, (notes 13, 83, 84, 153, 215,) treats of this topic fully. Speaking of the great practical importance, whether belligerency or a state of war be recognized or not by the political or executive department of the government, he says:

"If it is *a war*, the insurgent cruisers are to be treated by foreign citizens and officials, at sea and in port, as lawful belligerents; if it is not *a war*, these cruisers are *pirates*, and may be treated as such." Note 13.

Lawrence, in the notes to the last (7th) edition of Wheaton, referring to many of the authorities here cited, expresses no opinion of his own. But Wheaton himself, in his elaborate letter to Secretary Upshur, of August 23, 1843, (Exec. Doc. 28th Cong. 1st Sess., vol. 6, p. 4, Doc. 264,) concerning Paul Jones' prizes, restored by Denmark to England in 1779, says:

"Denmark must either have considered the United States as a *lawful belligerent* or as *pirates*, incapable of acquiring any of the rights of just war."

And, as we shall see further on, the language of diplomacy may be said to be almost unanimous that such are the only alternatives. The publicist Hautéfuille, in a letter published in the New York *Times* of January 4, 1862, says, in reference to the seizure of Mason and Slidell on the Trent, and the claim at that time, often put forth in defense, that the Confederates were only rebels, and not belligerents:

"If there then be no *war*, if the Americans be not *belligerents*, the act perpetrated by the commander of the San Jacinto [Commander Wilkes] against England is an outrage committed against the independence of the British flag; it is an act of downright *piracy*, for which the perpetrator, if he acted without the special order of his government, should be made responsible to the tribunals."

Boyd, in his notes on Wheat. Int. Law, (London, 1878,) says:

"When the struggle is carried on by sea as well as by land, the interests of neutral commerce render a recognition of belligerency absolutely necessary. Without it the struggle is not, in the eye of international law, a war; and, if not a war, there is no obligation on the part of neutrals to respect any blockade, or allow their merchant vessels to be stopped and searched on the high seas by the cruisers of either party. * * * If the conflict continues entirely unrecognized as a war, every insurgent is liable to be executed as a rebel or traitor on land, and as a pirate at sea." Page 36. "When an insurrection or rebellion has broken out in any state, the rebel cruisers may be treated as pirates by the established government, if the rebel government has not been recognized as a belligerent by the parent state, or by foreign nations; but this right ceases to exist on recognition of the rebels as belligerents. * * * The president's proclamation of nineteenth April, 1861, declaring the Confederate ports blockaded, settled the point by virtually recognizing the

South. From that time the duly-commissioned Southern cruisers became entitled to the rights of war, and ceased to be pirates." Page 169.

Further authorities to the same effect will be found in "Neutral Relations," and "England's Liability," by C. G. Loring, 1863–64; "Hasty Recognition," "Precedents of American Neutrality," and "American Neutrality," etc., by George Bemis, 1864–66; Mr. Sumner's Speech at Cooper Institute, Sept. 10, 1863; Article by Charles P. Kirkland in Merchants' Magazine, Nov. 1863, p. 330; English Neutrality, by G. P. Lowrey, March, 1863; Civil War in Am. by Comte de Paris, vol. 1, p. 426.

8. Several authors, such as "Historicus," Prof. Barnard, in his work on Neutrality, President Woolsey, and Hall, who express doubt, or the opposite opinion, either fall into clear inconsistencies, or treat the matter in its political, rather than its judicial, relations. All state that the judiciary are bound by the action of the political and executive departments; yet, in discussing the position of unrecognized rebel combatants, they sometimes fail to indicate whether they are treating of what ought to be the political action or the judicial; or, if treating of the latter, the limitations of the judiciary are more or less overlooked; so that the conclusions of these writers are either ambiguous, or are inapplicable to judicial action. As the action of the courts is wholly subordinate to that of the political and executive departments, as regards recognition of belligerency, the considerations presented on this subject by publicists are usually those that belong to the political and executive departments. Thus, the celebrated letter of Burke to the sheriff of Bristol is the letter of a statesman, addressed to statesmen; eloquent and powerful as a guide for political action, but having no relevancy to courts. It is rightly applied in the political letter of DALY, C. J., to Senator Ira Harris, (New York, 1863.) So the oft-quoted sections of Vattel concerning the rights of the two parties in a civil strife (bk. III. cap. 18, §§ 287–293) are "obviously addressed to sovereigns, not to courts." Per Chancellor KENT, in *Hoyt* v. *Gelston*, 13 Johns. 141, 155; per MARSHALL, C. J., in *Rose* v. *Himely*, 4 Cranch, 241, 272. This distinction must be continually borne in mind.

(a) The letter of "Historicus," (Sir Vernon Harcourt,) dated March 18, 1865, and published in the London *Times* of March 22, 1865, (see, also, appendix to Bemis' Hasty Recognition, Boston, 1865,) is a vigorous defense of the political and executive action of England in issuing her proclamation of neutrality. It has no direct discussion of the duty of the judiciary, and alludes to it incidentally only. He contends that had the queen's proclamation of neutrality not been issued, the rebel cruisers could not have been treated as pirates "by the governments and the courts," as though the two departments were in the same situation. But he sustains this proposition by a reference only to the *obiter* remarks of Judge NELSON in the case of *The Savannah*, by the rhetoric of Burke's letter, and the sections of Vattel

above referred to, which, as we have seen, are "addressed to sovereigns, not to courts." "An armed cruiser," he says, "exercising force against the ship of a foreign state, must be one of three things,—an enemy, a pirate, or a belligerent." She could not "be treated by the English government as an enemy," because England had no war with the South; therefore, he argues, not being a pirate, she must be a "lawful belligerent." By this reasoning, if in any case a recognition of belligerency may be rightfully *withheld* by a foreign government, of which there is no doubt, then it follows that in the absence of recognition, according to "Historicus," such a vessel must be treated as *a pirate;* which is the only point here in question. What is said in some passages of this letter concerning the power of the government to confer or to withhold belligerent rights has manifest reference to the particular circumstances of the existing Confederate war; for he lays great stress on the fact that the United States government had itself, by its own treatment of the revolt, recognized a war, and "created belligerent rights in both parties." In other parts of the letter he repeatedly recognizes the true doctrine that the action of the government as respects recognition controls; and that the courts, in the absence of any recognition, must treat rebel cruisers as pirates. "In such a question," he says, "the courts of law follow the action of the government." The proclamation was necessary, he argues, because the English merchantman was not to be "left in ignorance whether an armed vessel, which overhauled and captured him, was regarded by his own government in the light of a *pirate,* committing robbery on the high seas, or as a lawful *belligerent;*" nor was "the navy, posted in every corner of the globe to protect the mercantile marine by arms, if necessary, to be uninformed whether they were to sink, burn, and destroy as *pirates,* or to respect as lawful *belligerents,* the cruisers that exercised such acts of force as war alone can justify." These alternatives clearly recognize all the rights here claimed on behalf of the government against the Ambrose Light. Finally, he adds: "Why were *courts of law to wait* to know in what light they were to regard vessels or crews arraigned before them for forcible seizures at sea?"

(*b*) Prof. Barnard, in his work on British Neutrality, (London, 1870,) says that legally the question turns on the inquiry "whether an *animus furandi,* or *lucri faciendi,* in the strict sense of the phrase, be necessary to constitute the legal offense of piracy; whether, in the absence of it, proof of any other criminal intent would be sufficient; and whether the *animus belligerandi* would be held to be such a criminal intent by the tribunals of another country, the executive government of which had not recognized the existence of a war." While not expressing any decided opinion on this matter, as a legal question, he thinks such privateers, "at any rate, *ought* not to be so tried and punished;" and that "if a declaration of neutrality be necessary to prevent such an abuse of criminal justice," which he doubts, that "must be reckoned among the legitimate and useful purposes of

such a declaration." Pages 120, 121. I have already stated above why, if the warfare be *unlawful*, the *animus belligerandi* becomes felonious. At page 116, also, he suggests that recognition [of belligerency] ought not only to be *conceded*, but ought not to be *withheld*, from "any body of people whose number and organization enable them to carry on regular warfare, and who are actually engaged in it." This rule would very materially diminish the conditions under which rebels have been heretofore regarded as entitled to a recognition of belligerent rights. See Message of President Monroe, *supra;* Canning's Dispatch, *infra.* It excludes all consideration of the merits of the contest, of the probabilities of success, of the industrial and commercial interests of other nations; and of the ties of treaty, blood, and moral sympathy. The objection to this is that it subordinates all the interests of other nations to the interests, the wishes, and the convenience of rebels, however undeserving the struggle. It may be safely assumed that no government will ever be administered upon that principle. But even if the rule laid down be correct, it is a rule for the action of the government, not for the courts. The government, and not the court, must determine whether "the number and organization of the insurgents enable them to carry on regular warfare," and whether what they "are actually engaged in" is "regular warfare" or not. Further on the author adds that "it would be trifling with language to dignify with the name of *war*, the rebellion of which Massachusetts was the scene in 1786." Page 117. Recognition, it is implied, ought, in cases like the last, to be withheld; and, if rightfully withheld by the government in such a case, then, of necessity, the courts must hold the rebel warfare in that case unlawful, and their acts of menace or violence on the high seas as piratical; since it is mere contradiction and absurdity to say that the government may rightfully withhold recognition, and yet that its courts shall extend the same immunities without recognition as with it.

President Woolsey in a friendly review of Prof. Barnard's work in the N. A. Rev. for October, 1879, p. 259, dissents from that author's view of the *right* of rebels to recognition. On this point he says:

"No rule of international law forces a neutral state into an impartial attitude. It has its choice between aiding the parent state, and entire neutrality. * * * If it offer assistance, it is assistance, not against a state known to nations, but against a nondescript thing which has force and not law on its side, against a monster out of the pale as yet of the law of nations, and which threatens the order of the world. * * * International law is made for nations, and sides with the established order of things. It does not frown on help offered by one friendly state to another, and yet it allows states to sit still and see their friends fight their own battles."

(c) Hall, in a recent and valuable work on International Law, (London, 1880,) while rejecting the *animus furandi* as any criterion of piracy, and regarding unrecognized rebel cruisers as "at first sight technically piratical," concludes as follows: "The true view would seem to be that acts allowed in war, when authorized by a *politi-*

*cally organized society,* are not piratical," [though that society is not recognized by other nations,] but are piratical if committed "by a body of men acting independently of any politically organized society." "Whether a particular society is or is not politically organized, is a question of fact which must be decided upon the circumstances of the case." Pages 217, 218. But decided by whom? By the courts, on trials for piracy or prize? or by the political and executive authority? Our supreme court, in *U. S.* v. *Palmer,* 3 Wheat. 634, upon that point say:

"Such questions are generally rather political than legal in their character. They belong more properly to those who can declare what the law shall be; who can place the nation in such a position with respect to foreign powers as to their own judgment shall appear wise; to whom are intrusted all its foreign relations,—than to that tribunal whose power, as well as duty, is confined to the application of the rule which the legislature may prescribe for it. In such contests a nation may engage itself with the one party or the other; may observe absolute neutrality; may recognize the new state absolutely; or may make a limited recognition of it. * * * If the government remains neutral, and recognizes the existence of a civil war, its courts cannot consider as criminal those acts of hostility which war authorizes, and which the new government may direct against its enemy. * * * It follows * * * that persons or vessels employed in the service of a self-declared government, *thus acknowledged* to be maintaining its separate existence by war, must be permitted to prove the fact of their being actually employed in such service by the same testimony which would be sufficient to prove that such vessel or person was employed in the service of an acknowledged state."

Manifestly no light is thrown on the subject by mere changes of phrase. An "organization as a political society" can be of no avail unless the organization be one that is *competent* to authorize warfare: *i. e.,* a *quasi* sovereign for war purposes. Every city, county, state, in this country, is a "society politically organized." But if the mayor of New York should send out vessels commissioned in his own name to blockade Baltimore or Boston, and to capture or sink any British ships seeking to enter those ports, it would not be contended that the British navy must remain quiet, and see such vessels sunk, unable to arrest the cruiser as piratical, because New York city was a politically organized community.

(*d*). President Woolsey says the Confederate cruisers were not pirates. Int. Law, App. 3, note 12 to 4th Ed., § 145 of 5th Ed. He does not mention the fact in that connection, but does elsewhere, (App. 3, note 19; § 180, 5th Ed.,) that the Confederates were recognized as belligerents at home and abroad; but he says they lacked the *animus furandi,* and the intent of an indiscriminate hostility; both of which, as we have seen, are not essential. He then lays down this rule:

"A privateer of an *organized* rebellious community, acting under letters of marque, given by the supreme authority, *according to law,* is not doing piratical work when, in a state of *open war,* it preys on the commerce of its *enemy,* although its government [its independence?] be as yet unrecognized."

The context does not show whether this rule is designed by the author for political or for judicial guidance. But its language is applicable to cases only where there has already been previous recognition of belligerency; since in courts the words "open war," "enemy," "organized rebellious community," import previous political recognition. The courts, as I have so often said, cannot inquire into or determine the existence of those conditions. Thus construed, his rule accords with the view here adopted. It is doubtful, however, whether that is the sense intended by the author. He adds that "such has been our [government's] declared views and claims;" and he refers to the action of Denmark in 1779 in treating Paul Jones' cruisers as piratical, and in restoring his prizes to England, and to our long-continued reclamations. This, however, was a political, not a judicial, act on the part of Denmark; and, as will appear presently, does not sustain the view for which it is apparently cited. Indeed, in the same author's review of Prof. Barnard's work above referred to, (N. A. Rev. October, 1879, p. 261,) he cites the case of those prizes as parallel with the situation of the Confederate privateers, which had full foreign recognition of belligerency; so that they clearly could not justly be deemed piratical by foreign nations. And in the same paragraph he recognizes the position of Denmark as that of a *neutral*,—a position importing previous recognition of belligerency, express or implied. "The claim," he says, "that the flag of rebellious colonies could not be respected by *neutrals*, was brought forward when Paul Jones carried these prizes into a port of Norway," etc.

From other passages in his work on International Law it is doubtful whether the author intended to express any precise views on the point here involved. At section 179, after saying that *revolters* have not strictly any rights at the hands of other nations, he observes:

" In a certain sense foreign powers *must* regard the revolters as *belligerents*, entitled to all the rights of humanity,   *   *   *   such as asylum given to political exiles, etc.   *   *   *   The vessels of *such* revolters cannot be regarded as piratical, for their motive is to establish a new state; while that of pirates is plunder. A pirate never ends his war with mankind. They fight for peace." See, also, section 180*b*, (5th Ed.)

These loose, equivocal, and inconsistent expressions of recent authors show how vain is the endeavor to divest insurgent cruisers of their technically piratical character in courts of justice, if they have been nowhere politically recognized as lawful belligerents; and that this cannot be done, except by clothing the courts with an original authority to inquire into the facts, circumstances, and merits of a foreign strife, and thereupon to determine, independently of the political and executive departments, the *status* to be accorded it; or else by declaring that neither political nor executive recognition is of any account; and that insurgent cruisers, though not recognized as belligerents or as lawful combatants, shall yet enjoy the same immunities as if they were both recognized and lawful. The error lies in

not observing the limitations of the judicial functions, which preclude the courts from recognizing any new authority in foreign nations until the political or executive department has done so. Until then, courts have no discretion in holding all intentional, unlawful violence and injury to others as criminal. The ulterior end and motive are, as I have said, not a justification in the courts, whether that motive be plunder, a livelihood, political ambition, or patriotic ardor.

9. The precedents in the history of the recognition of belligerency, the conduct of diplomacy, treaties, and the declarations of the most eminent statesmen on this subject, agree with the view here taken; and on any other view they would be unintelligible. Recognitions of belligerency by foreign nations in cases of civil strife have in great part this end in view: to make the warfare lawful, so as to avoid the complications of what would otherwise be irregular, unlawful, and piratical depredations. I have already referred to King James' privateers, to the Magellan pirates, and to the Texan case of the Invincible; to the neutrality, or implied recognition of our belligerency, by nearly all the European governments during our revolutionary struggle; to our own early recognition of the belligerency of the revolutionists of Texas, of Greece, and of the various Spanish-American colonies. In the latter case the course of England was tacitly the same. During the early part of the struggles of the South American colonies, England was at war with Napoleon, and opposed his pretensions to the sovereignty of the Spanish-American colonies. Upon their revolt they became in effect the allies of England. An extensive and profitable trade sprang up between England and those colonies; so that, upon the downfall of Napoleon and his dependencies, so identified had English interests become with the provinces, that Spain, in order to prevent a more pronounced hostility against her, secured by treaty from England a stipulation for *impartial neutrality* in the struggle of Spain with her colonies; although it was understood that this should not affect England's commercial privileges. 2 Stapleton's Life of Canning, 10–14, 86. And the merit of securing general recognition of the final independence of the South American colonies is claimed by his biographer for Canning. Id. 23, 72.

Numerous treaties, in agreeing to prohibit letters of marque, declare that their subjects, if accepting them, may be treated as pirates. See Hall, Int. Law, 220–222. Such, also, were the declarations of the governments of Belgium and of the Netherlands after the treaty of Paris, (1856,) before alluded to; and I have already cited the rule declared by Prof. Perels on that subject, that the commission, being unlawful as to such subjects, may be disregarded, and the persons treated as pirates by all other nations. The reclamations made by this country upon Denmark for the prizes of Paul Jones restored by her to England in 1779, furnish no exception to the rule here laid down. Some account of this claim is given in note 16 of Lawrence's Wheaton. A more complete history of it will be found in Reports

of House Committees, February 10, 1846, 29th Cong. 1st Sess. vol. 1, No. 206; and in Mr. Wheaton's letter to Secretary Upshur, August 23, 1843, (not indexed,) in vol. 6 of Exec. Doc. 28th Cong. 1st Sess. Doc. 264, p. 4. From these documents it appears that Denmark had previously professed to act as *neutral*, and had thus, either expressly or by implication, already recognized our belligerency. As Lawrence observes, (note 16, *supra*,) Count Bernstof's letter in reply to Franklin's, (see Spark's Life of Franklin, vol. 8, pp. 407, 433, 460,) did not deny this recognition, but pleaded a secret treaty with England, which, however, was never produced. That letter indicates plainly enough secret pressure from England; and shows that policy, and not principle, had controlled the action of Denmark. To deliver up our prizes as captured piratically, after professions of neutrality or implied recognition of our belligerency, without notice prohibiting our entry to her ports, was so inconsistent with her previous attitude as to afford just ground for reclamations. But had Denmark actually refused us recognition of belligerency, and on that ground delivered up our prizes which had put into her ports under stress of weather, without any previous notice, that would have been politically so unjustifiable an exercise of her discretionary power under our circumstances at that time as to furnish us, on establishing independence, a just cause for reclamations for an unreasonable abuse of her discretion. For these transactions were more than a year and a half after our independence, even, had been actually acknowledged by France, and after our alliance with her was publicly known.

The grounds upon which these reclamations were urged in the house report, and in the letter of Mr. Wheaton, were the violation of her neutral obligations. Mr. Wheaton, in his letter above referred to, says:

Denmark remained passive, bound to the duties of impartial neutrality. * * * It was not the case of an ordinary revolt which has not assumed the character of a *civil war*. The United States, in 1779, were a government *de facto*, engaged in a war with Great Britain, *in which the rights of war were acknowledged by the parent country itself*. We were associated with two powers, France and Spain, in war against Great Britain, and both had acknowledged our independence. * * * The only reason said to have been alleged by Denmark for rescuing the prizes was that Denmark had not yet acknowledged the independence of the United States. But the question is, not whether she had acknowledged the independence of the United States, but whether such a state of war actually existed between the United States and Great Britain as made it the duty of all nations *professing to be neutral* to respect the just exercise of the rights of war by both. Denmark must either have considered the United States as *lawful belligerents*, or as *pirates*, incapable of acquiring any of the rights of just war."

These extracts cover the whole ground, not only of that case, but of the present question. They state the question with Denmark as a political one, which concerned her political duty under the actual facts; that she had acted accordingly by professing neutrality; and that she had no alternative but to regard us as lawful belligerents,

or as pirates. Yet our claims, so far as I can discover, have never been paid.

Canning uses similar language in his oft-quoted dispatch to the British minister at Constantinople, in reply to the protest of the Porte against the recognition of the Greek insurrection as belligerent. "Belligerency," he says, "is not so much a principle as a fact. A certain degree of force and consistency acquired by any mass of population engaged in war entitles that population to be treated as a belligerent, [through the action of the political department.]   *   *   *   A power or community   *   *   *   which is at war with another, and which covers the sea with its cruisers, must either be acknowledged as a belligerent, *or treated as a pirate.*" 2 Stapleton's Life of Canning, 408-414.

This dispatch was cited and approved by Lord John Russell in his speech in parliament on the sixth of May, 1861, (Hansard, Par. Deb. v. 163, p. 1566;) and in his speech in September, 1863, (London *Times*, September 26th,) he says, in justification of the early recognition of Confederate belligerency: "Our admirals asked whether the ships they met bearing the Confederate flag *should be treated as pirates or no.*" It is possible, however, that at the time of this speech there was some error of dates in Lord Russell's mind. See Geo. Bemis, Hasty Recognition, 12, note.

By the treaty of Paris (1856) "privateering is and remains abolished" as between the parties to it. Accordingly, the Netherlands government, in June, 1861, issued a proclamation warning all its subjects "in nowise to take part in privateering, because the Netherlands government had acceded to the declaration of maritime rights set forth by the treaty of Paris conference of 1856, whereby   *   *   *   privateering is abolished, and *no recognition of commissions* got or letters of marque permitted. Also that such commissions cannot have a lawful effect in behalf of the king's subjects. Those who, under such circumstances, shall engage in or lend their aid in privateering to other people, *will be considered as pirates,* and prosecuted according to law." See U. S. Mess. & Doc. 1861, p. 354.

The Belgian government and other governments issued a similar general notice that all "its subjects who shall take any part in any privateering expedition will expose themselves to the danger of *being treated as pirates abroad,* and to their prosecution before Belgian tribunals with all the rigor of the law." Barnard, Neutrality, 146; Perels, Mar. Law, p. 189.

It is well known that early in 1861 the United States opened negotiations with England and France towards joining in the treaty of Paris, for the purpose of excluding rebel privateering. England and France both refused to accede to the proposal "until after the present war;" "because the provisions of the treaty [of Paris] standing alone might bind them to pursue and punish the privateers of the South *as pirates,*" and consequently the negotiations failed. U. S. Mess. & Doc. 1861,

pp. 146, 242. Thus was an important international measure defeated because those governments were of opinion that if the rebel commissions of privateers should thus become legally *invalidated* their cruisers must then be deemed *pirates*; and that the parties to the treaty of Paris would be bound to seize and punish them as such, though no such express obligations are found in that declaration.

The same liability to the punishment of piracy, in the absence of political recognition, was frequently stated in express terms, or implied, in the important debate in the house of lords on May 16, 1861. Lord Derby said that the "United States cannot be suffered to treat Englishmen who may improperly engage in privateering as pirates, because we have declared that the southern states are entitled to the rights of belligerents." Lord Brougham said: "Privateering was undoubtedly, *in the case of recognized belligerents*, not piracy, according to the law of nations; * * * but if any persons, subjects of this country, fitted out a vessel against another country with which we were at peace, that in itself constituted a *piratical act.*" Ex-Lord Chancellor CHELMSFORD (Sir FRANCIS THESIGER) said: "If the Southern Confederacy had not been recognized by us as a belligerent power, any Englishman aiding them by fitting out a privateer against the Federal government would *no doubt be guilty of piracy.*" Lord Chancellor CAMPBELL said that "the president of the council had laid down the law with perfect correctness. *After the present proclamation,* [recognizing belligerency.] * * * there could be no doubt that he [a person entering the service of a privateer] ought not to be regarded as a pirate for acting under a commission from a state admitted to be entitled to the exercise of belligerent rights, and carrying on what might be called a *justum bellum.*" Lord Kingsdown said: "This country had recognized, not as an independent power, but as a body possessing the rights of a belligerent, the confederation of the southern states; *therefore*, they were treated as having power to issue a regular authority for privateering."

This great weight of authority, drawn from every source that authoritatively makes up the law of nations, seems to me fully to warrant the conclusion that the public vessels of war of all nations, for the preservation of the peace and order of the seas, and the security of their own commerce, have the *right* to seize as piratical all vessels carrying on, or threatening to carry on, unlawful private warfare to their injury; and that privateers, or vessels of war, sent out to blockade ports, under the commissions of insurgents, unrecognized by the government of any sovereign power, are of that character, and derive no protection from such void commissions.

It thus appears that the rules laid down and implied in the decisions of our supreme court in the cases of *Rose* v. *Himely* and *U. S.* v. *Palmer, supra,* nearly 70 years ago, have been since almost universally followed. The practical responsibility of determining whether insurgent vessels of war shall be treated as lawful belligerents, or as

piratical, rests where the supreme court then in effect decided that it ought to rest, viz., with the political and executive departments of the government. These departments have it in their power, at any moment, through the granting or withholding of recognition of belligerency, and through the extent of such recognition as they may choose to accord, virtually to determine how such cruisers shall be treated by the courts. Even after judgment and sentence the prisoners may, like Smith and his associates, convicted before Mr. Justice GRIER, be treated, and exchanged, as prisoners of war. And it is with those departments exclusively that the discretion ought to rest to determine when and how its technical rights against rebel cruisers shall be enforced. Its naval regulations will be framed accordingly; and any seizures made under such regulations may be enforced, or at any moment remitted, at the pleasure of those departments.

Where insurgents conduct an armed strife for political ends, and avoid any infringement or menace of the rights of foreign nations on the high seas, the modern practice is, in the absence of treaty stipulations or other special ties, to take no notice of the contest. One of the earliest applications of this rule that I have met is in the answer of the states-general to Sir Joseph York's demand in 1779 for the surrender of Paul Jones' prizes as piratically captured, (*supra*, p. 417,) in which their Mightinesses say that "they had for a century past strictly observed the maxim that they will in no respect presume to judge of the legality or illegality of the actions of those who, upon the open sea, have taken any vessels that do not belong to this country." On this point Prof. Lawrence, in his recent Hand-book Int. Law, (London, 1884,) says:

"When a community, not being a state in the eye of international law, resorts to hostilities, it may, in respect of war, be endowed with the rights and subjected to the obligations of a state if other powers accord it what is called recognition of belligerency. Neutral powers should not do this * * * (4) unless it affect by the struggle the interests of the recognizing state. If the struggle is maritime, recognition is almost a necessity. The controversy of 1861 illustrates the whole question."

The practice is stated by Hall as follows:

"When, however, piratical acts have a political object, and are directed solely against a particular state, it is not the practice for states other than that attacked to seize, and still less to punish, the persons committing them. It would be otherwise, *so far as seizure is concerned*, with respect to vessels manned by persons acting with a political object, *if the crew, in the course of carrying out their object, committed acts of violence against ships of other states* than that against which their political operation was aimed; and the mode in which the crew were dealt with would probably depend on the circumstances of the case." Int. Law, § 81, p. 223.

Whether a foreign nation shall *exercise* its rights only when its own interests are immediately threatened, or under special provocations only, after injuries inflicted by the insurgents, as in this case, at Colon, is a question purely for the executive department. But when

a seizure has been made by the navy department, under the regulations, and the case is prosecuted before the court by the government itself, claiming *summum jus*,—its extreme rights,—the court is bound to apply to the case the strict technical rules of international law. The right here asserted may be rarely enforced; the very knowledge that the right exists tends effectually, in most cases, to prevent any violation of it, or at least any actual interference by insurgents with the rights of other nations. But if the right itself were denied, the commerce of all commercial nations would be at the mercy of every petty contest carried on by irresponsible insurgents and marauders under the name of war.

In the absence of any recognition of these insurgents as belligerents, I therefore hold the Ambrose Light to have been lawfully seized, as bound upon an expedition technically piratical.

*Second.* The additional facts proved show, however, such a subsequent implied recognition by our government of the insurgent forces as a government *de facto*, in a state of war with Colombia, and entitled to belligerent rights, as should prevent the condemnation of the vessel as prize. The communication from the department of state to the Colombian minister, bearing date the day of the seizure, seems to me to constitute such a recognition by necessary implication. It could not have been based upon any facts, or have reference to any state of facts, not in existence at the time of the seizure; and it should be held, therefore, to arrest and supersede any subsequent condemnation for those acts of war which such a recognition authorizes the insurgents to carry on.

Recognition of belligerent rights may be tacit, implied, or express. It is express when made by a proclamation of neutrality, as by the queen of England's proclamation of May 13, 1861. It is implied in a declaration of blockade, as in that of President Lincoln of April 19, 1861. And when there is long acquiescence in belligerent acts affecting another nation's interests, without protest or objection, such as the blockade of ports, or the use of a nation's ports as a harbor for prizes, a tacit recognition of belligerent rights is to be reasonably inferred. See Canning's dispatch above referred to. Where no formal and express action has been taken by the political or executive department as to recognition of belligerency, courts, in determining the question of prize or no prize, must necessarily pass upon the legal effect of such proved action of those departments of the government as bears upon the question of recognition.

On the part of the captors in this case a letter was put in evidence from the secretary of state, dated July 1, 1885, in answer to an inquiry as to the action of our government concerning any recognition of a state of war between the insurgents and Colombia. In this letter the secretary of state replies that "a state of war has not, *in a formal sense*, either before or after April 20, 1885, been recognized by the government of the United States as existing in the United States of Colombia;

nor have the insurgents now in arms against the latter government been recognized by the United States as belligerents, nor, so far as advised, by the United States of Colombia." The claimants thereupon put in evidence certain correspondence between the Colombian government and our department of state, consisting of a communication from the former to our government, dated April 9, 1885, and the reply made thereto made by Secretary Bayard, dated April 24, 1885. The letter from the Colombian minister, after reciting information that the "entire republic is now pacified, with the exception of the ports of Panama, and those of Sabanilla, Santa Maria, and Barranquilla, in the states of Bolivar and Magdalena," and that "active military operations were in preparation against the rebels who hold these points in our territory," directs the attention of our government to two decrees that had been made by the government of Colombia, with a view to make these operations more efficient. The first decree declared the ports of Sabanilla and Santa Maria closed to foreign commerce, and all trade to or from these ports illicit and contraband; the second decree declared, in effect, that the rebel vessels then operating against Cartagena were irregular and unlawful, and were flying the Colombian flag without authority, and were beyond the pale of international law, and might be repressed by the vessels of any other nation charged with watching its commercial interests.

Our government, in the reply of the secretary of state, under date of April 24th, declined to acquiesce in either of those decrees. The secretary states his conclusion, as the result of an examination of the authorities and precedents, "that a decree by a sovereign power closing to *neutral* commerce ports held by its *enemies*, whether foreign or *domestic*, can have no international validity, and no extraterritorial effect in the direction of imposing any obligation upon the governments of *neutral powers* to recognize it." After referring to the great efforts by which our blockades were made effectual in the Confederate rebellion, he says that Great Britain and France ceased to contest their effectiveness, and "united in the most solemn repudiation of the position formerly taken by them, that a *belligerent* can, by mere decree, give binding international effect to the asserted closure of a port he does not hold." Accordingly, the secretary, while declaring that this government "will recognize any effective blockade," refused to admit the right of the Colombian government to close its ports held by the insurgents, except by an effective blockade; and declares that its decree, "by itself, is entitled to no international respect," and that "vessels manned by parties in arms against the government, when passing to and from ports held by such insurgents, or even when attacking ports in possession of the Colombian government, are not pirates by the law of nations, and cannot be regarded as pirates by the United States."

The attitude assumed by our government in these conclusions is of itself, by necessary implication, a recognition of the existing insur-

rection as constituting a state of civil war. It assumes that the Colombian government, as respects the ports in question, is a *belligerent;* that the insurgents hold those ports as a *de facto* power, to the exclusion, for the time being, of the Colombian government and of its sovereign authority; that they are in arms against the latter government; and it is declared that our government will not recognize any attempt by the Colombian government to close these ports by virtue of its own sovereignty as lawful or valid; nor any closure, except by means of an effectual blockade, *i. e.*, by acts of war. In saying that it would recognize no rights of the Colombian government at those ports, except *belligerent* rights, our government implies belligerent rights in those who hold those ports adversely. "The claim of the belligerent right of blockade for the North," says "Historicus," in the letter before referred to, "in fact declared the belligerent rights of the South." And in the *Prize Cases* (2 Black, 670) the supreme court say a blockade "is, of itself, conclusive evidence of a state of war." Our government could not say that Colombia shall exercise no rights but *belligerent* rights, and at the same time deny such rights to the opposite party. No stronger assertion by implication of the rebel *de facto* authority, and of a state of war, as it seems to me, could well be made.

Moreover, almost the entire argument of the secretary's letter imports this. In stating the rule of international law by which he is governed, he speaks of ports held by "*enemies*, foreign or domestic," and of the rights of "*belligerents*," and refers to our own government as a "neutral power," not bound by a closure under such circumstances. These are words of perfectly defined meaning in the writings of diplomatists and publicists. Of themselves they import a state of war, and of the belligerent rights that in a state of war belong equally to both parties. Thus understood, the language and the doctrines of the letter on this point give precise expression to the undoubted law of nations. Though it contains no express recognition, no recognition "*in a formal sense*," the language and the substance of the letter import a virtual and implied recognition of the insurgents' belligerency.

The same inferences must be drawn from the precedents and authorities cited in the communication. These are too long to be here quoted in full. First is quoted the rule deduced by Lawrence, (note on Wheat. pt. 4, *c.* 3, § 28; note 241, p. 846): "Nor does the law of blockade differ in *civil war* from what it is in foreign war. Trade between foreigners and a port in possession of *one of the parties to the contest* cannot be prevented by a municipal interdict. * * * Whenever the dominion over the land is lost by its passing under the control of another power, whether in *foreign war* or *civil war*, the *sovereignty* over the waters capable of being controlled from the land *ceases*." The situation of New Grenada in 1861 is cited, when her notification to this government of the closing of certain ports, and that her war-vessels

would cruise about those ports to seize vessels attempting to violate it, was interpreted by Mr. Seward as a notice of an effective blockade; while the opinion of the British government, considering it not a blockade, was that the closure was invalid, because "in the event of an *insurrection* or *civil war* in that country it is not competent for its government to close ports that are *de facto in the hands of the insurgents*, as that would be a *violation of international law with regard to blockade*." The correspondence between our minister, Mr. Adams, and Lord John Russell, to the same effect, in reference to the closure of the Confederate ports, and the effective blockade that our government maintained, are also referred to; also Mr. Cobden's speech on October 25, 1862, in which he says: "It is only upon condition that the blockade shall be effectively maintained *as between belligerents*, that European nations recognize it [closure by a mere municipal decree] at all." Finally, the authority of Prof. Perels is cited, in his work on Maritime Int. Law, above referred to, to the effect that "closure of ports in possession of insurgents is invalid except by blockade." The section of that work in which this principle is said to be laid down, is not given; and I have been unable to find this doctrine affirmed except in connection with a state of recognized belligerency or civil war, such as that of the late Confederate States.

In the above extracts the italics are my own. They indicate and imply, in each instance, except possibly that of Grenada, the facts of which I have not been able to ascertain, the previous existence of a recognized state of war, or belligerent rights on the part of the insurgents. In the extract from Lawrence it is a case of "*civil war*" that he is speaking of; *i. e.*, a case of recognized belligerency. The correspondence with Mr. Adams, and the speech of Mr. Cobden, were long after the recognition of the Confederate States as belligerents, both by this country and by England. The doctrine of *pacific blockades*, maintained by some authors, Lawrence says, cannot be sustained as to *neutrals*. Note 241, p. 845. "Blockade," he says, "is an act of war;" and repeated decisions of the supreme court affirm this explicitly. *Prize Cases*, 2 Black, 670; *The Venice*, 2 Wall. 274; *Mrs. Alexander's Cotton*, Id. 417; *The William Bagaley*, 5 Wall. 402; *Mauran* v. *Insurance Co.*, 6 Wall. 14; *Thorington* v. *Smith*, 8 Wall. 1. See Bemis' Hasty Recognition, 25, 26. Our own example, which is most strongly dwelt upon as an instance of an effective blockade under difficult circumstances, was during a recognized *state of war*, of which the blockade itself "was conclusive proof."

Upon these considerations and on these authorities I cannot doubt that in thus notifying the Colombian government, in effect, that the United States would recognize no right in Colombia to close the insurgent ports by virtue of her own sovereignty, but only through the exercise of the belligerent right of blockade, *i. e.*, by war, our government recognized, by necessary implication, the existing insurrection as a state of war, and the insurgent forces as a *de facto* power,

having the counter-rights of a belligerent. From this indirect and implied recognition of the belligerency of the insurgents, the conclusion of law follows that their vessels of war cannot be regarded as piratical. The refusal of the department of state so to treat them followed necessarily from the implied recognition previously declared. As a mere declaration of the exercise of a discretionary executive authority, it would not, and does not, announce any rule of law binding upon the court; and my decision on this point is not based on that declaration as a discretionary act, but upon the necessary implication of a recognition of a state of war in Colombia in the previous parts of the communication.

To avoid irritations among friendly powers it may often be expedient, in cases of domestic strife, to withhold all express announcements of neutrality, or recognition of belligerency, until some occasion makes it necessary; and where the insurgents studiously avoid interference with foreign vessels on the high seas, or with their freedom of commerce, recognition may be long delayed, and no occasion arise for foreign nations to take notice of the strife, whether on land or sea.

*Third.* As to costs. Where the seizure has been upon probable cause, but the vessel found not really liable to seizure, it is usually released without costs. Thus, in *The Marianna Flora*, 11 Wheat. 1, 58, a remarkable case of mutual mistake, neither costs nor damages were given to either side. Here the seizure was rightful, as I find; and the discharge is granted upon causes subsequent. The necessary disbursements should therefore fall upon the vessel and not upon the United States. *The Imina*, 3 C. Rob. 167; *The Principe*, Edw. 70; 2 Wheat. App. 57. These disbursements should be small, as the trial was begun on the return-day of the process. But as there is no condemnation, there can be no commissions nor counsel fees allowed. Only the clerk's, marshal's, and prize commissioner's fees can be taxed; and upon payment of these, the vessel should be discharged from custody.

